[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-14548

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DOUGLAS MOSS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

D.C. Docket No. 7:18-cr-00019-HL-TQL-1

_____

_____

No. 19-14565

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DOUGLAS MOSS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

D.C. Docket No. 7:18-cr-00019-HL-TQL-1

_____

On Petition for Rehearing by the Panel

Before WILLIAM PRYOR, Chief Judge, LUCK, and ED CARNES, Circuit
Judges.

ED CARNES, Circuit Judge:

We issued an opinion in this appeal on April 12, 2022. The defendant-appellant, Douglas Moss, filed a petition for rehearing en banc, which we will consider as a petition for panel rehearing. *See* 11th Cir. R. 35, I.O.P. 2 ("A petition for rehearing en banc will also be treated as a petition for rehearing before the original panel."); *Cadet v. Fla. Dep't of Corr.*, 853 F.3d 1216, 1218 (11th Cir. 2017) ("At least until an order granting or denying the petition for rehearing en banc is issued, a panel retains authority to modify its decision and opinion.").

The petition, insofar as it requests panel rehearing, is granted to the extent that we vacate our earlier opinion, *United States v. Moss*, 30 F.4th 1271 (11th Cir. 2022), and issue this one in its place.

The petition for rehearing en banc remains pending. In light of the issuance of this revised panel opinion, Moss is granted 21 days to file a supplement to his petition for rehearing en banc, if he wishes to do so. *See* Fed. R. App. P. 40(a)(4)(C); *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1337 (11th Cir. 2019). He is not required to file a supplement. If he does file one and the Court desires a response from the government, it will be requested.

This is our revised opinion:[1]

Medicare and Medicaid combined spend $1,500,000,000,000 a year, which is more than one-third of the total health expenditures in this country.[2]  Like other government health care programs, these two work on the honor system.  Trust and more trust.  Both programs take a pay first, ask questions later (if ever) approach.  Which leads to crime and more crime, both sooner and later.

A trust-based system is only as good as the people who are trusted.  Douglas Moss is one of those who was trusted but not trustworthy.[3]  As a physician, he fraudulently billed Medicare and

---

[1] We have added one paragraph before the final paragraph in Section IV.A. Other than the addition of that paragraph, this opinion is the same as the one that we issued before.

[2] See Center for Medicare & Medicaid Services, National Health Expenditure Fact Sheet (Dec. 15, 2021, 4:06 PM), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet.

[3] Moss was a physician at the time of the events in this case, but after he was convicted and sentenced, he surrendered his medical license.  That fact is not included in the record, but we can take judicial notice of it as a publicly available state agency record, a copy of which has been sent to the clerk for placement on the docket.  See Ga. Composite Medical Bd., https://gcmb.mylicense.com/verification/Details.aspx?result=192f58db-1778-44c2-af52-bbe883fa1a62 (last visited Apr. 12, 2022); United States v. Howard, 28 F.4th 180, 186 (11th Cir. 2022); see also 11th Cir. R. 36 IOP 9 ("When an opinion of the court includes a citation to materials available on a website, the writing

19-14548                Opinion of the Court                5

Medicaid for millions of dollars for visits to nursing home patients that he never made.  Someone else with a lower billing rate made some of those visits, and others never took place.

For his fraudulent conduct, Moss was convicted of conspiracy and substantive health care fraud, sentenced to 97 months imprisonment, ordered to pay restitution of about 2.2 million dollars, and ordered to forfeit around 2.5 million dollars.  He appeals, challenging the convictions, sentence, restitution amount, and forfeiture amount, which is nearly every component of the judgment against him.  And he loses on every component of his appeal.

## I.  FACTUAL BACKGROUND

To explain Moss' crimes (what he did, not why he did it which is obvious) we will begin with how Medicare and Medicaid determine how much health care providers will be paid.  Then we will turn to how Moss arranged his billing practices to defraud the programs.

### A.  Medicare and Medicaid

Medicare and Medicaid are federally funded health care programs.  To make things simpler, from this point forward we will focus on Medicare (which suffered the brunt of his fraud) with the

---

judge will send a copy of the cited internet materials to the clerk for placement on the docket.").

understanding that what is said about it applies to Medicaid as well, except where noted.

Medicare pays "claims," which are requests by a health care provider to be "reimbursed" (paid) for services provided to Medicare recipients. A claim contains a variety of information, including where the medical service was provided, the dollar amount being billed to Medicare, and an identification number for the health care provider. It also contains a code for the procedure or service performed.

Those codes are called the "CPT codes," which stands for Current Procedural Terminology codes. CPT codes are a national uniform coding structure created for use in billing and overseen by the American Medical Association. They are used by all health insurance companies and by Medicare and Medicaid. A code represents at least two things: the procedure or service performed and the level of complexity involved in it. One type of procedure or service can have more than one CPT code because the same procedure may, in some cases, be more complex than in others. Generally, for any given category of procedure, the more complex the performance, the higher the number used for its code. In turn, a higher CPT code generally gets a higher reimbursement amount from Medicare.

Most of the fraud in this case involves claims for visits to nursing homes, so we will use that area of care to illustrate how CPT codes work. When a patient enters a nursing home, a health care provider's first visit with that patient is categorized as "initial

nursing facility care," which corresponds to a particular set of three CPT codes. The highest of those three is 99306.  According to a CPT manual issued by the AMA, a 99306 coded visit "requires these 3 key components: [a] comprehensive history; [a] comprehensive examination; and [m]edical decision making of high complexity." Giving that code to a visit also means that the problem requiring admission to the nursing home is usually one of "high severity," and that the health care provider's visit typically takes 45 minutes.

For later visits to nursing home patients, which are categorized as "subsequent nursing facility care," there are four codes: 99307, 99308, 99309, and 99310.  For 99309, the CPT manual states that it requires two of the following three "key components": a detailed interval history, a detailed examination, and medical decision making of moderate complexity.  The manual also states that for a 99309 coded visit: "[u]sually, the patient has developed a significant complication or a significant new problem" and "[t]ypically, 25 minutes are spent at the bedside and on the patient's facility floor or unit."  As for code 99310, the first two "key components" must be "comprehensive" instead of just "detailed" and the third must involve "[m]edical decision making of high complexity" instead of just "moderate complexity."  The manual states that "[t]he patient may be unstable or may have developed a significant new problem requiring immediate physician attention," and that the visit typically takes 35 minutes.

For Medicare to pay a claim (or "reimburse" it), several requirements must be met.  The service must be provided to a real

patient who is properly enrolled as a Medicare beneficiary; it must be provided by a health care provider properly licensed and "enrolled" as a Medicare provider; it must be a service covered by Medicare; and it must be properly documented and billed. The service also must be reasonable and medically necessary. Health care providers sign a "certification statement" agreeing that they will comply with all of those requirements and will not submit false claims.

When Medicare reimburses a claim, the amount that it pays is based on a predetermined fee schedule that it sets. A health care provider is free to submit a claim for a dollar amount that exceeds the amount in the fee schedule, but Medicare will not pay more than the schedule amount. It is common practice for physicians to submit claims exceeding the amount in the fee schedule, even though they know they won't get reimbursed the excess amount.

An important fact that determines how much Medicare pays the provider is whether the service was performed by a physician or a non-physician. In the nursing home setting, Medicare requires a distinction between non-physicians, or "mid-level practitioners" as they are called, and physicians. Physician's assistants and nurse practitioners must bill at a rate that is only 85% of the physician's rate.

And to properly bill Medicare at the physician's rate for services provided in a nursing home setting, the physician must be the one in the patient's room directly providing the service to the

patient. When an assistant performs the service, the claim submitted to Medicare must disclose that fact.

## B. The Fraud Scheme

Moss was the medical director and attending physician at four nursing homes. He recruited Shawn Tywon to be his physician's assistant and, as it turned out, his co-conspirator. Moss had Tywon help with the nursing home patients, and he trained Tywon how to conduct visits with those patients.

Between January 2012 and January 2015 Moss billed 31,714 claims to Medicare for nursing home visits; 477 were coded as 99306, the highest code for "initial nursing facility care." And 25,468 were coded as 99309, and 5,769 as 99310, which are the two highest codes for "subsequent nursing facility care." In that three-year period, Moss billed $6,701,163.00 for those claims, and Medicare reimbursed him $2,171,098.85. As for Medicaid, during that same three-year period, Moss billed 17,336 claims for those same codes, and Medicaid paid him $336,524.84. Nearly all of those claims were submitted to Medicare as though Moss had personally performed the services.

Those numbers suggest a staggering amount of work, a seemingly impossible amount of it. And, as it turned out, that amount of work was impossible. The claims Moss submitted would have required him to see more than 50 patients a day for 293 of the days in the three-year conspiracy period, and even more than 100 a day on some days and more than 150 a day on other days.

Not only that, but based on how long the CPT manual suggested those visits should take, Moss was sometimes billing Medicare for services that added up to more than 24 hours a day. He did that on 275 days. And on some days he billed for services that would have taken him more than 70 hours on that day. The services Moss billed on one stellar day would have required him to put in nearly 100 hours in that one 24-hour period. People sometimes wish there were more hours in a day, but Moss alone miraculously stretched some of his days to far more than 24 hours.

Of course, Moss' miracle was non-miraculous, old-fashioned fraud. He obtained money to which he was not entitled by making statements that weren't true, or failing to disclose what was true. One way he crammed into some days more services than any day could hold is by claiming he had performed services that others actually had done. He did that so he could bill those services at the higher physician rate when payment should have been calculated at the lower rate due the non-physician who had actually performed the services. Typically, that non-physician was Tywon, who was his physician's assistant, or it was a different employee who was a nurse practitioner. Moss specifically directed that those services be billed in his name at his higher rate even though he knew that because those services were performed by non-physicians they could lawfully be billed only at a lower rate.

The claims submitted during two periods of time, which are the basis for the substantive counts against Moss, are examples of what he did. The first is a series of claims for nearly $52,000, which

collectively represented that from February 1 through 5, 2014, Moss personally saw 234 Medicare patients and 134 Medicaid patients in Georgia. The second is a series of claims for just over $80,000, which collectively represented that from June 10 through 18, 2014, Moss personally had seen 345 Medicare patients and 193 Medicaid patients in Georgia. Those two sets of claims are outstanding in the field of Moss' fraudulent claims because, instead of being in Georgia treating patients on those dates, as he claimed, Moss had been in Las Vegas gambling.

Moss did not travel on only one fraudulent path. In addition to submitting claims that were fraudulent because he had not performed the services that he had billed in his name and at his rate, he submitted claims that were fraudulent in another way. He also submitted claims that were fraudulent because — whoever he claimed had performed them — they were for services that were medically unnecessary or did not involve the level of complexity indicated by the CPT codes that Moss put on those claims. Recall that between January 2012 and January 2015, Moss submitted 31,714 claims for services that he represented were covered by the highest CPT codes, which were meant to reflect the most complex procedures or services and that typically required 25 to 45 minutes a visit. The reality was nowhere close.

Tywon testified that "probably for 95 percent of the time or more" when he himself had visited a patient, "there was nothing to do." Instead, what he would do is walk into the patient's room, ask if everything was okay, and because a "majority of the time" the

patient said he didn't need anything, Tywon would then leave. He usually did not do a physical examination, take blood pressure, or check the patient's pulse. As Tywon stipulated in his plea agreement, he would just "lay eyes" on the patients, spending only "3 to 5 minutes with" them during visits, except for in the uncommon event that they had some actual medical need. According to him, there was no medical purpose for most of the visits and he did not think he had any reason to be making them. Moss had him make the visit anyway and bill it at the highest code solely because Moss wanted to increase his payments from Medicare, which he did. In that way, Moss added another layer of fraud on top of billing in his name instead of Tywon's name; he also billed for any services that were provided as if they were far more complex and time consuming than they actually were.

The notes Tywon generated for his patient visits were entirely consistent with his testimony. They were typically copy-pasted from one visit to the next with the only changes being the date, a brief indication of what the patient was doing (like eating lunch or watching tv), and typically noted that there were "no changes" or "no complaints," meaning there was nothing new that was wrong with the patient. Usually when Tywon wrote "no changes" instead of "no complaints," it indicated that the patient was asleep when he visited and did not even wake up. That is a far cry from what the CPT manual required for the high codes Moss used to bill the visits: 25 minutes of time, a "significant new

problem," and a detailed interval history or examination with med-ical decision making of moderate complexity.

## II.  PROCEDURAL HISTORY

### A.  Indictment and Trial

Moss and Tywon were indicted for defrauding Medicare and Medicaid.  The indictment alleged one count of conspiracy to com-mit health care fraud, in violation of 18 U.S.C. § 1349, and six counts of health care fraud, in violation of 18 U.S.C. § 1347.  The six substantive counts were for specific claims Moss submitted dur-ing the two time periods when he was in Las Vegas but billed Med-icare and Medicaid for seeing patients in Georgia.  Tywon pleaded guilty to conspiracy and agreed to cooperate with the government.

Moss went to trial.  After a seven-day trial, a jury found him guilty on all counts.  The jury had heard from several witnesses including Moss' former employees, a person from a billing com-pany Moss had used, government investigators, and Tywon. Those witnesses testified to Moss' intimate knowledge of Medicare and Medicaid's reimbursement rates and coding policies, his in-structions to generate more (fraudulent) claims to bill to the two programs, and his instructions to bill all claims in his name and at the highest CPT codes despite his knowing that doing so was ille-gal.  The jury also heard evidence about how the representations Moss made in the billings were impossible: his claiming to have performed more than 24 hours of services a day, his claiming to have seen over 50 patients a day, and his claiming to have seen

patients in Georgia when he was actually in Las Vegas.  It wasn't a close case.

## B.  Sentencing

Moss' presentence investigation report recommended a guidelines range of 78 to 97 months.  That range was based primarily on a loss of $6,701,163, which was the amount Moss had billed to Medicare and Medicaid; that factor alone caused an 18-level increase to his offense level.  After much argument about the loss amount, the district court adopted the PSR but reduced the loss amount by 10 percent to $6,031,046.70.  That reduction was for what the court estimated to be the value of legitimate medical services that Moss had provided.  The ten percent reduction to the loss amount did not, however, change the guidelines range.

The court sentenced Moss to 97 months imprisonment, the top of the guidelines range.  It also ordered him to forfeit $2,507,623.69 and to pay $2,256,861.32 in restitution.  The forfeiture amount was for the total that Medicare and Medicaid had paid to Moss, with no reduction for any legitimate services he had provided.  The restitution amount was what Medicare and Medicaid had paid Moss, with the 10 percent reduction based on the court's estimate of the legitimate services Moss had provided.

Moss moved for a new trial, which the district court denied.  This is his appeal of his convictions and sentence, as well as of the restitution and forfeiture amounts.

## III.  CONVICTION ISSUES

As we said in another health care fraud case, Moss "raises [three] contentions about his convictions, [none] of which questions the sufficiency of the evidence to convict him." *United States v. Pon*, 963 F.3d 1207, 1219 (11th Cir. 2020).  And none of which has any merit.

### A.  The Testimony of Tywon's Attorney

Moss contends that the district court erred in quashing his subpoena of Tywon's attorney, Miles Hannan.  Moss argues he could have used Hannan's testimony to impeach the testimony of Tywon, the government's key witness.  But that is not what attorney Hannan's testimony would have done.

### 1.  Background

As mentioned, Moss' co-conspirator Shawn Tywon pleaded guilty to conspiracy and agreed to cooperate with the government.  Part of Tywon's plea agreement addressed his compensation during the conspiracy.  It stated that "Tywon was paid $4500 bi-weekly by Moss . . . .  Aside from his paychecks and occasional loans from Moss, Tywon received no other form of compensation."  Later, while being prepared by the prosecutor for his testimony at Moss' trial, Tywon revealed that he'd also received cash payments from Moss "on a semi-regular basis" and that Moss had occasionally paid some of his expenses.

The government became concerned that Tywon had breached his plea agreement and that attorney Hannan might be

disqualified from representing him.  Acting on that concern, it filed a motion seeking clarification from the court of whether Hannan had a conflict of interest.  The conflict, according to the motion, was that Tywon told the government he had not mentioned the cash payments sooner because "Hannan[] had instructed him not to mention receiving cash beyond his paychecks to the government 'unless they specifically ask about it.'   Tywon indicated he had . . . acted under Attorney Hannan's advice not to mention the cash . . . throughout his plea negotiations and entry."

The motion recounted that the government had contacted Hannan and asked him if he "had instructed Tywon to conceal material facts from the government."  As the government's motion described it, Hannan denied doing so and his "version of his conversations with Tywon is diametrically opposed to that of his client."

The court held a hearing on the government's motion for clarification.  At the hearing, the court talked with Tywon and Hannan in chambers and outside the presence of the government and Moss.  Tywon told the court about his and Hannan's failed efforts to inform the government before the entry of the plea about the cash payments.  He also told the court that when the prosecutors asked why he hadn't brought it up sooner he told them: "Well, because Mr. Hannan told me that when you asked me to bring it up."

Hannan confirmed Tywon's statements were "substantially accurate," confirmed he had not instructed Tywon to conceal the cash payments, and indicated what he'd told Tywon was that he

"didn't need to volunteer any information, just answer any questions." He also told the court that the cash payments had "been there all along" because they were "considered to be loans," which is "in the Plea Agreement." The court ruled that there was only miscommunication, not any misconduct, and that Hannan was not disqualified.

Moss sought to call Hannan to testify at Moss' trial, thinking that Hannan would contradict Tywon's testimony. At trial, after Moss' defense counsel examined Tywon in front of the jury and then briefly questioned Hannan outside the presence of the jury, the court quashed Moss' subpoena of Hannan. It ruled that his testimony would have been about communications protected by the attorney-client privilege and that Tywon had not waived the privilege.

2. Analysis

Moss argues that the court erred in ruling that Tywon had not waived the attorney-client privilege and in quashing the subpoena of Hannan on that basis. He also argues that the district court's ruling violated his Fifth and Sixth Amendment rights to present a defense. The government responds that Moss failed to preserve the constitutional objection, meaning plain error review applies, and that the court committed no error under any standard anyway. It also argues that any error was harmless.

There are two things we need not decide. The first is whether Moss preserved his constitutional objection. *Cf. Pon*, 963

F.3d at 1225–26 (discussing in dicta how not every contemporaneous objection is a "constitutional objection" and that "[o]ur precedent indicates that an objection on nonconstitutional grounds is not enough to preserve a constitutional issue") (quotation marks omitted). We need not decide that issue because Moss' argument fails whether we apply *de novo* or plain error review.

The second issue we need not decide is whether Tywon waived the attorney-client privilege. Even if he did and the court erroneously quashed the subpoena of Hannan in violation of Moss' constitutional rights, any error was harmless beyond a reasonable doubt. *See id.* at 1226–27 (explaining that a "constitutional error is harmless if the government proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," and satisfying that standard "necessarily means that any nonconstitutional error . . . was harmless as well") (quotation marks omitted). The court's ruling was harmless because Hannan's testimony would not have helped Moss, and likely would have hurt him by corroborating Tywon's testimony.

Moss' theory rests on a faulty foundation: that Hannan's testimony could have been used to impeach Tywon. He bases that belief on the government's motion seeking clarification of whether Hannan was disqualified. That motion stated that Hannan's "version of his conversations with Tywon is diametrically opposed to that of his client." But Moss fails to account for all the evidence, testimony, and clarification that came after that motion. And what he doesn't account for indicates the opposite of what Moss

asserts — it shows that Hannan's testimony would have corroborated Tywon's testimony, not impeached it.

That Hannan would have corroborated Tywon's testimony is evident both from the conversation the two of them had with the district court judge in chambers and from the questioning of each of them during the trial.  In chambers, Tywon explained to the judge what had happened, including the fact that he had initially told the government that he did not bring up the cash payments sooner "because Mr. Hannan told me that when [the government] asked me[,] to [then] bring it up."  When asked if Tywon's explanation was "substantially accurate" Hannan said "yes."  That's agreement not disagreement, corroboration not contradiction.

The consistency between Tywon's and Hannan's accounts of what happened was also evident in what took place in the courtroom.  Moss' counsel cross-examined Tywon extensively in the presence of the jury about the cash payments and plea agreement. He asked Tywon if he had told the government that his "lawyer told [him] not to reveal the cash throughout the investigation, to the judge or to anyone."  Tywon responded unequivocally: "No." That is the same answer attorney Hannan gave during the trial when Moss' defense counsel asked him outside the presence of the

jury whether he had told Moss to conceal the cash payments from the government.[4]

After more cross-examination at trial, Tywon specified what he'd told the government about the payments: "My attorney told me not to volunteer that until it was asked — or not to reveal that until I was asked." That is also what Hannan had previously told the court, before the trial, when he was questioned by the court in chambers. And when Moss' counsel had a chance to question Hannan at the trial and outside the presence of the jury, counsel did not ask him whether he had simply given Tywon the generalized advice about not volunteering information. Had that question been asked of Hannan, as the government surely would have if he had testified before the jury, his in-chambers statement indicates that his answer would have been consistent with Tywon's testimony.

There is more evidence that Hannan would have corroborated Tywon's testimony that the cash payments were considered "loans," which the plea agreement expressly mentioned. Tywon testified before the jury that Moss had told him the cash payments were actually loans and that Tywon did not have to claim them on his taxes because "the accountant has it worked out as a loan." Earlier, during the in-chambers questioning, Hannan had told the judge that the cash payments had "been there all along" because

_____

[4] Hannan was not on the stand or under oath when he gave that answer. The district court explained that: "You are an officer of the Court. It is not required that you be put under oath."

the "money that [Tywon] was receiving in the form of cash was later considered to be loans," so "it's in the Plea Agreement." Had he testified before the jury, Hannan would have corroborated Tywon's testimony about the cash payments being loans.

As a result, any erroneous exclusion of attorney Hannan's testimony was harmless beyond a reasonable doubt. His testimony would not have impeached Tywon's.

## B. Character Witnesses

Moss contends that the district court erred in limiting how many character witnesses he could present to "rebut[] the government's attempt to portray Dr. Moss as an uncaring, unsympathetic doctor, only concerned about money."

Moss was allowed to present six character witnesses: four former patients, one former patient's wife, and one registered nurse who had worked with him in an emergency room. Those witnesses testified in detail about the medical care that Moss provided, and they testified consistently that in their opinions he had a good character and was compassionate, caring, and honest. Their testimony covered a total of roughly 54 transcript pages. When Moss attempted to call even more character witnesses — he had as many as ten more he wanted to put on the stand — the court denied him permission because their testimony "would be cumulative."

Moss challenges that ruling. He argues that he needed more character witnesses to rebut the government's portrayal of him

22                    Opinion of the Court                    19-14548

because "quantity is quality," and it would be harder for the jury to dismiss opinions about Moss if "they were supported by patient, after patient, after patient."

It is well-established that district courts have considerable "discretion to limit the number of character witnesses" and that "we should overturn these determinations 'rarely and only on a clear showing of prejudicial abuse of discretion.'" *United States v. Benefield*, 889 F.2d 1061, 1065 (11th Cir. 1989) (cleaned up) (quoting *Michelson v. United States*, 335 U.S. 469, 480 (1948)); *see also* Fed. R. Evid. 403.

The discretion vested in the district courts has long been recognized, originating at least a century ago in a decision of our predecessor Court. *See, e.g.*, *Chapa v. United States*, 261 F. 775, 776 (5th Cir. 1919) (affirming the district court's decision to allow only 13 of 150 tendered witnesses to testify that they had been cured by an occultist because "[i]t is discretionary with a trial court to limit the amount of cumulative evidence, and in this case it does not appear that this discretion was abused").[5] We have upheld a district court limiting a defendant to presenting only five of ten character witnesses, *see Benefield*, 889 F.2d at 1065–66, and have several times upheld a limit of three, *see, e.g.*, *United States v. Gray*, 507 F.2d 1013, 1015–16 (5th Cir. 1975). Those decisions and others like

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

them establish that Moss has not made a "clear showing of prejudicial abuse of discretion" in the district court's limitation on his number of character witnesses. *Benefield*, 889 F.2d at 1065 (quotation marks omitted).

We add that Moss overstates the importance of character witness testimony in this case. The court prohibited the character witnesses from testifying to Moss' billing practices, a ruling he does not challenge. And billing practices were what mattered given the charges. Moss was not on trial for being unkind or uncaring, or for not being compassionate when he did see patients, but for lying about seeing some patients at all and for billing Medicare for services he did not provide.

## C. Closing Argument

Moss contends that the district court improperly limited part of his counsel's closing argument when he was discussing whether Moss had made a profit. The government had argued that he was motivated by profit. And profit is relevant to motive, which is always relevant in a criminal case. *See United States v. Hill*, 643 F.3d 807, 843 (11th Cir. 2011). But the argument of Moss' counsel that the court limited was not about whether profit had motivated Moss. Instead, it was about whether the government had proven Moss' medical practice made a profit. That argument would have

misled the jury by treating profit as an element of the crime and the failure to prove profit as a basis for acquittal.

Defense counsel began by discussing the expenses Moss had practicing medicine. He argued that the government had "brought you an FBI agent who spent all this time looking at the bank records. I don't know what the math is in Washington, but Dr. Moss had all of the expenses." After briefly discussing those expenses, counsel said: "And [the government is] saying [Moss] made a profit? There's not one bit of proof. They have a duty to prove it beyond a reasonable doubt. They don't prove it, you acquit."

A transcript paragraph later, Moss' counsel went back to what the government had to prove, stating:

> So now, as you said, the judge will tell you we don't have to prove anything because he's presumed innocent. They failed to bring you any accounting that he made a dime. That he made a dollar. Or that he didn't lose money. It's vacant. But they stood up here and said it went into his bank account. Not into Shawn Tywon's.

At that point the court intervened. It stated that whether Moss "made a profit in his medical practice was not an issue in the case, and I think that's an improper argument. And I so instruct the jury. Don't argue that."

That ruling and that instruction were not error. It is one thing to argue that a defendant was not motivated by profit and

another to argue that he didn't commit a crime because there was no proof that he had netted a profit. No one, including criminals, is perfect. A person can be motivated to commit a crime by hope of profit, even though he does not succeed in turning one. The government does not have to prove a penny of profit to establish the elements of fraud. A paucity of proof of profit is no defense. Defense counsel was not entitled to argue that it was.

## IV. SENTENCE ISSUES

Moss challenges the loss amount used to determine his sentence, the dollar amount he must pay in restitution, and how much he must forfeit.

### A. Intended Loss Amount

Moss contends that his sentence should be vacated because the district court miscalculated the loss amount attributable to him, resulting in an offense level and a guidelines range that were higher than they should have been. An issue about the calculation of the guidelines range goes to the procedural reasonableness of the sentence. *See United States v. Green*, 981 F.3d 945, 953 (11th Cir. 2020).

The district court found that Moss was accountable for a loss amount of $6,031,046.70. That finding was based on an intended loss of $6,701,163. That was the amount Moss had billed to Medicare, reduced by 10 percent, which was the court's estimate of the value of the legitimate medical services he had provided. Moss attacks both the intended loss amount of $6.7 million which he thinks

should be lower, and the 10 percent reduction which he thinks should be higher.

"[W]e review the district court's loss determination only for clear error." *United States v. Bazantes*, 978 F.3d 1227, 1249 (11th Cir. 2020). Because "[d]istrict courts are in a unique position to evaluate the evidence relevant to a loss determination, . . . their determinations are entitled to appropriate deference." *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015); *accord* U.S.S.G. § 2B1.1 cmt. n.3(C). A district court need not make a precise determination of loss amount, but only a reasonable estimate of it given the available information. *Moran*, 778 F.3d at 973. The estimate must be based on "reliable and specific" facts, and the court cannot "speculate about the existence of facts that would result in a higher sentence." *See id.* Instead, it must make factual findings about the loss amount "based on evidence heard during trial, undisputed statements in the PSI, or evidence presented during sentencing." *Id.*

As for the intended loss amount attributed to Moss, the court followed U.S.S.G. § 2B1.1 and its commentary about intended loss. That commentary is "binding on the courts" because it does not "contradict the plain meaning of the text of the Guidelines." *See United States v. Wilks*, 464 F.3d 1240, 1245 (11th Cir. 2006) (quotation marks omitted). It specifies that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). And it also specifies that "[i]ntended loss" is "the pecuniary harm that the defendant purposely sought to inflict," including

"pecuniary harm that would have been impossible or unlikely to occur." *Id.* at cmt. n.3(A)(ii). One example the commentary gives of unlikely harm that should be included is "an insurance fraud in which the claim exceeded the insured value." *Id.*

And when it comes to "federal health care offenses involving government health care programs," § 2B1.1's commentary provides a rebuttable presumption that the intended loss equals the amount the defendant billed a government agency. *Id.* at cmt. n.3(F)(viii) (emphasis and capitalization omitted). The commentary puts it this way: "[T]he aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted." *Id.*

Moss contends that presumption was rebutted because the evidence showed he was highly knowledgeable about Medicare's reimbursement policies. He argues that evidence establishes he knew Medicare would not pay more than what is in its reimbursement schedules, regardless of how high he overbilled. Moss' argument actually goes further than that. He argues he knew Medicare's reimbursement schedules so well that he knew exactly how much he'd get: the roughly $2.5 million that Medicare ended up paying him. And since he knew that Medicare would pay only $2.5 million, he argues, that was the amount he intended to receive, and no more than that.

We will assume that Moss' knowledge of Medicare's reimbursement policies and schedules is enough to rebut the presumption in § 2B1.1's commentary that the intended loss was the amount he billed Medicare. Even assuming that, the district court still did not clearly err in finding that Moss' intended loss is $6.7 million, not $2.5 million.

After all, intended loss is "pecuniary harm that the defendant *purposely sought* to inflict" and also "includes intended pecuniary harm that would have been impossible or *unlikely* to occur." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii) (emphasis added). The plain meaning of that definition is confirmed by the commentary's insurance fraud example we mentioned. *Id.* What makes it unlikely the actual loss will be as high as the full amount of the fraudulent insurance claim is that the claim exceeds the insured value, and insurance companies rarely if ever slip up and pay the excessive amount. The hypothetical defendant in that commentary example knew it was "unlikely" the claim would be paid in full, but he submitted the full amount anyway with the greedy hope that he would mistakenly be paid the full amount.

That commentary example is similar to what Moss did. He intentionally billed in a way that would maximize the money he received from Medicare. As the district court put it: "[W]hile [Moss] may not have expected that Medicare . . . would reimburse him at a rate of 100 percent, it is apparent that he manipulated his billings to maximize his profits. The Court finds this evidence credible." The way Moss "maximized" his profits was by always billing

his claims at a rate higher than the one in Medicare's schedules. That matters because Medicare pays either the billed amount or the scheduled amount, whichever one is lower. If the schedule says $100 and the physician's claim says $60, Medicare will pay $60. But if the schedule says $100 and the physician's claim says $120, Medicare will pay $100. By billing more than the scheduled amount, Moss ensured that he always got the full amount Medicare would pay.

That's not the only way that overshooting the payment schedules profited him. Medicare adjusts those schedules at least annually. By billing well over the scheduled amount, Moss may have been able to capture rate increases up to his billed amount. His own argument is that he knew Medicare's reimbursement policies exceptionally well. It follows that he would have known about Medicare periodically adjusting its payment schedules. He would have known how inflating the amount of each bill would get him the maximum possible payments from Medicare and the full benefit from any of its schedule increases.

Our *Moran* decision does not help Moss. In that case we held that the district court did not clearly err when it found that the amount paid by Medicare, instead of the billed amount, was the intended loss for two of the defendants. *Moran*, 778 F.3d at 974–75. Those defendants had "submitted evidence demonstrating that they had been aware of Medicare's lower reimbursement rate *and* had projected future revenue in accordance with that rate." *Id.* at 974 (emphasis added). Moss has not pointed to any evidence, such

as revenue projections based on the actual reimbursable amount, to show that he was not trying to obtain anything beyond the amount he was entitled to receive under the schedules. Moss has identified only his knowledge of Medicare's reimbursement rates, but *Moran* involved defendants who presented evidence of knowledge plus revenue projections. *Cf. Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("A holding that X + Y is enough to violate a provision does not mean that X alone is not enough.").It was unlikely that Medicare's rates would have increased all the way up to the amount Moss billed, or that Medicare would have mistakenly paid him the full billed amount. But Moss tried. As we've said several times now, intended loss includes even loss and harm that is unlikely to occur. The factfindings made by the district court show that Moss' actions fall within § 2B1.1's commentary and its example. Our review of the intended loss amount is only for clear error, and there is none.

## B. Restitution

Moss contends that the $2,256,861.32 the district court ordered him to pay in restitution is too much. The court added the amounts that Medicare and Medicaid had paid him for claims billed under CPT codes 99306, 99309, and 99310, which came to a total of $2,507,623.69. It reduced that amount by $250,762.37, based on the court's estimate that 10 percent of the services Moss provided had been legitimate.

19-14548                Opinion of the Court                31

Moss claims that he is entitled to more than a 10 percent re-duction for legitimate services.  He claims that the 10 percent re-duction is based on nothing but a single line of testimony from Tywon: his statement that when he visited patients "probably for 95 percent of the time or more, there was nothing to do," meaning that 95 percent of the time the visits were not medically necessary. (The court apparently doubled the percentage of medically neces-sary visits from Tywon's testimony, which was to Moss' benefit.) Instead of relying on Tywon's testimony, Moss says, the court should have used an estimate he provided in a sentencing memo-randum and presented at the sentence hearing.  Moss' estimate was that the value of legitimate services was $1,079,219.39, which would reduce restitution to $1,428,404.30.[6]

We review *de novo* the legality of a restitution order, but only for clear error the factual findings underpinning the order. *United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013).  We will find a clear error if, "after reviewing all the evidence, we are

---

[6] The loss amount that determines Moss' offense level is also reduced for le-gitimate services rendered.  *See* U.S.S.G. § 2B1.1 cmt. n.3(E)(i).  Moss received an increase of 18 levels because the loss amount was between $3.5 and $9.5 million.  *See* U.S.S.G. § 2B1.1(b)(1).  We have already held that the proper starting point for calculating Moss' loss amount is an intended loss of roughly $6.7 million.  *Supra* at 29.  Even if we subtract from that figure the total amount of legitimate services Moss argues he provided, it would not take the loss amount below $3.5 million, so it would not affect his guidelines range. Any error would be harmless.  *See United States v. Sarras*, 575 F.3d 1191, 1220 n.39 (11th Cir. 2009).

left with the definite and firm conviction that a mistake has been committed." *United States v. Alicea*, 875 F.3d 606, 608 (11th Cir. 2017) (quotation marks omitted).

"Under 18 U.S.C. § 3663A(c), [the Mandatory Victims Restitution Act,] a defendant convicted of fraud must pay restitution to victims of the offense." *United States v. Bane*, 720 F.3d 818, 827 (11th Cir. 2013). Restitution "must be based on the amount of loss actually caused by the defendant's conduct," *United States v. Baldwin*, 774 F.3d 711, 728 (11th Cir. 2014), and reduced by the value of legitimate medical services provided, *see Bane*, 720 F.3d at 828. Moss "bears the burden to prove the value of any medically necessary goods or services he provided that he claims should not be included in the restitution amount." *Id.* at 829 n.10.

When calculating the restitution amount, "the determination . . . is by nature an inexact science, [and] where difficulties arise, a district court may accept a 'reasonable estimate' of the loss based on the evidence presented." *Baldwin*, 774 F.3d at 728 (citation omitted). Difficulties have certainly arisen here. There is no "definite and easy" way to calculate restitution with "a simple mathematical exercise." *United States v. Sheffield*, 939 F.3d 1274, 1277–78 (11th Cir. 2019). Although there is a record of how much Medicare and Medicaid paid to Moss and that number is exact, the dollar amount of legitimate services is anything but exact. The only thing anyone can do is estimate.

That includes Moss, who, as mentioned, provided the district court with an estimate of legitimate services. He provided the

estimate in a sentencing memorandum that explained the methodology behind it, and he also called as a witness at the sentence hearing the medical practice consultant who had helped prepare Moss' estimate.

After the court reviewed the sentencing memorandum, listened to extensive direct and cross-examination of Moss' medical practice consultant witness, asked that witness additional questions, and heard argument from and questioned the attorneys, the court rejected Moss' estimate. The court primarily pointed out a problem with Moss' methodology. It noted that he had presented evidence that patients had been visited, but not that the visits were medically necessary in the first place. The court put it like this: "While presenting evidence as to the number of visits performed, [Moss] has failed to present evidence establishing the legitimacy of those visits. It is of no consequence that Mr. Tywon may have seen an average of 4.5 rehab patients a day when Mr. Tywon has testified that 95 percent of those services were fraudulent."

We have carefully reviewed Moss' estimate and conclude that the district court did not clearly err in rejecting it and in identifying the fatal defect in his methodology we just discussed. The burden was on Moss to show that the services he provided were medically necessary. *See Bane*, 720 F.3d at 829 n.10. When services are not medically necessary, Medicare reimburses at a rate of $0. Because of that, it does not matter how many medically unnecessary visits Moss and his employees may have made to patients, which was the basis of Moss' estimate. Zero times a thousand is

still zero. Because Moss' estimate failed to embrace, salute, or even nod at medical necessity, the district court did not clearly err in giving it little or no value.

As for the district court's estimate of 10 percent, it was not clearly erroneous and there was evidence supporting it. One major piece of evidence was Tywon's testimony. He estimated that only five percent of the time when he visited patients was there anything to do. The court's findings about legitimate services expressly relied on Tywon's testimony, indicating that it found him credible. We defer to the court's credibility determinations. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). (As we've mentioned, just to be safe the court doubled in Moss' favor Tywon's estimated percentage of legitimacy, which is not something Moss can complain about.) Additionally, Tywon's testimony was supported by the notes that documented his patient visits, which were mostly copy-pasted from one to the next and rarely reflected any changed medical conditions.

Our review of Moss' estimate and the court's reasons for rejecting it does not leave us with a firm and definite conviction that the court made a mistake. The court committed no clear error in rejecting Moss' estimate and in ordering restitution in the amount of $2,256,861.32.

## C. Forfeiture

The district court ordered Moss to forfeit $2,507,623.69. That is the total that Medicare and Medicaid paid him for claims

billed under CPT codes 99306, 99309, and 99310.  Unlike with the restitution amount, the court did not reduce the forfeiture amount by 10 percent for legitimate services.  Nor, for that matter, did it reduce the forfeiture amount by any estimate for legitimate services.  Moss contends that was error.  He argues that the forfeiture amount must be reduced by the amount of legitimate services he provided.  The issue turns in part on statutory interpretation and in part on a factual determination.

"In reviewing forfeiture orders, we review findings of fact for clear error and legal conclusions *de novo*."  *United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021).  We review *de novo* questions of statutory interpretation.  *United States v. Segarra*, 582 F.3d 1269, 1271 (11th Cir. 2009).

An important preliminary point is that just because the loss and restitution amounts were reduced by 10 percent does not necessarily mean the forfeiture amount must be.  "[R]estitution and forfeiture serve different goals.  The focus of restitution is on the victim, but forfeiture focuses on the defendant."  *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009) (citation and quotation marks omitted and alterations adopted).  Unlike restitution, "forfeiture is also a punitive action against the defendant."  *Id.* at 1344–45 (quotation marks omitted).  In addition to those different purposes, the forfeiture order in this case was required by different and broader statutory text than the restitution order. That text is our focus.

Forfeiture was ordered under 18 U.S.C. § 982(a)(7), which provides that, in convictions for federal health care offenses like Moss', the court "shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." The question is whether that text encompasses the proceeds Moss' received for providing legitimate services. The key to answering the question is determining what makes proceeds "gross proceeds traceable to the commission of the offense."

Our precedent tells us how to make that determination. We have effectively defined § 982(a)(7)'s use of the words "gross proceeds traceable" to impose a "but for" standard. *See Hoffman-Vaile*, 568 F.3d at 1344. We did so in holding that a defendant who had been reimbursed by Medicare as well as private parties had to forfeit the amounts received from both Medicare and the private parties. *Id.* We concluded that the amounts the defendant "received from private insurance companies [were] 'gross proceeds traceable to the commission of' her fraud *because, but for her Medicare fraud, she would not have been entitled* to collect these sums." *Id.* (emphasis added).

The D.C. Circuit has used similar "but for" reasoning when deciding whether forfeiture ordered under § 982(a)(7) excludes legitimate services from proceeds. *See United States v. Bikundi*, 926 F.3d 761 (D.C. Cir. 2019). It held "no" in a case where the money obtained from the fraud had propped up the defendants' legitimate services. *See id.* at 793. As the district court had found, the fraud

was pervasive and the defendant's operations could not have continued at all without it. *Id.* Part of its findings were that the defendants' company "would not have operated *but for* [each] defendant's fraud" and that the total amount of Medicaid proceeds received "was *only* paid due to the defendants' persistent and rampant fraudulent conduct." *Id.* (quotation marks omitted; alteration and emphasis in original). "Because the pervasive fraud was integral to each and every Medicaid payment to" the defendants, all of the payments were properly considered as being "constituted" or "'derived, directly or indirectly' from 'gross proceeds traceable'" to the fraud. *Id.* (quoting 18 U.S.C. § 982(a)(7)) (alteration accepted).

That statutory interpretation points us toward using a but for test, which leaves this factual determination: but for his Medicare fraud, would Moss have been entitled to collect proceeds for his legitimate services? *See Hoffman-Vaile*, 568 F.3d at 1344; *Bikundi*, 926 F.3d at 793. "But for" means that if one thing hadn't happened another thing would not have happened. "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020). So we ask if Moss had not committed fraud, would he have been entitled to any proceeds for his legitimate services?

As an illustration, consider a hypothetical where a doctor submits three claims. Claims one and two involve some legitimate services but are fraudulent because they are improperly billed while claim three is legitimate and properly billed, not fraudulent.

Take away the fraud — which is claims one and two — and claim three would still be for legitimate proceeds that the doctor would be entitled to be paid for even without the fraudulent claims.[7]

Compare and contrast that with Moss. As in the hypothetical, Moss' fraud was his improper billing of claims. But take away the fraudulent billing and what's left? The record does not reveal any of Moss' claims that were both for legitimate services and properly billed — no "claim three" category claims were shown. Not a single one. As far as the record shows, it's all fraudulent billing. During both the sentence proceedings and this appeal Moss has not identified one specific claim in the record that was properly billed.

Here's the thing. It is not enough that Moss and his employees may have provided *some* underlying legitimate services but overbilled for them. That's not enough because Medicare values an improperly billed claim at $0, regardless of what amount of underlying legitimate services might have been provided and could have been reimbursed if there hadn't been any improper billing.

---

[7] There may still be reasons that claim three in that hypothetical would fail the but-for test. One reason would be a *Bikundi* scenario, where the legitimate services were being so heavily propped up by money from the fraud that they could not exist without it. *See Bikundi*, 926 F.3d at 793 (holding there should be no reduction in the forfeiture amount based on legitimate services where the district court had found that the defendant's "continuing operations were maintained based on fraudulent records in employee and patient files and fraudulent timesheets submitted for reimbursement").

For example, if a medical service was performed by a physician's assistant and could properly have been billed at $75, but was improperly billed at the physician's rate of $100, Medicare would not value that claim at, or pay, $75. Instead, Medicare would value the claim at, and pay, $0 because it was improperly billed. Had Medicare known of Moss' improper billing, it would not have paid him some discounted rate — it would have paid him nothing. The gross proceeds from an improperly billed claim are all traceable to the improper billing, even the portion of proceeds that could have been paid for legitimate services if they had been properly billed.

Because the question of whether the record shows any of Moss' claims were properly billed is a factual one, we review only for clear error the district court's implicit finding that none were properly billed. *See Goldstein*, 989 F.3d at 1202. Given Moss' failure to identify a single properly billed claim, he has not persuaded us that the district court clearly erred.

**AFFIRMED.**