[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 22-12677

Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CARIE LYN BEETLE,
a.k.a. Carie Lyn Douglas,

Defendant-Appellant.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:19-cr-80234-KAM-1

_____

Before ROSENBAUM, GRANT and HULL, Circuit Judges

PER CURIAM:

After a jury trial, Carie Beetle appeals her total sentence of 60 months' imprisonment for conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. § 1349, and money laundering, in violation of 18 U.S.C. §§ 1957 and 2. On appeal, Beetle argues the district court erred: (1) in applying a 22-level increase in her offense level under U.S.S.G. § 2B1.1(b)(1) based on the amount of loss; and (2) in awarding $17,242,910.95 in restitution. After review, we affirm Beetle's sentence and the restitution amount.

## I. BACKGROUND

### A.    Offense Conduct

Beetle's convictions arose out of fraud associated with a substance abuse treatment center and a sober home in Florida owned and managed by Beetle and Eric Snyder. Beetle and Snyder conspired to defraud insurance companies by submitting claims for urinalysis and treatment that was either medically unnecessary or not provided.

At trial, the government presented evidence, including testimony from Snyder, that patients submitted to drug testing several times per week even though the drug tests were not reviewed by a doctor or used to guide patients' treatment. Beetle and Snyder also had employees and patients forge patients'

signatures on sign-in sheets, backdate forms, and create fraudulent documents to make it appear as though patients attended therapy sessions or submitted to drug testing when they did not. And they paid kickbacks and bribes to individuals with private insurance who agreed to reside at the sober homes, attend therapy sessions, and submit to regular testing for purposes of billing the individuals' insurance plans.

Employees lacking the necessary licenses conducted the therapy sessions. Patients skipped therapy and tested positive without consequences. Patients signed each other in for therapy sessions and then did not attend. Doctors did not review drug tests or reviewed them only after ordering another drug test.

A forensic accountant testified that Beetle and her co-conspirators submitted insurance claims totaling $49,503,037.12 and were paid $17,242,910.95.

## B.    Presentence Investigation Report

Beetle's presentencing investigation report ("PSI") stated that Beetle and Snyder submitted claims of approximately $58,209,385 for substance abuse treatment and received $20,209,691 in reimbursements from insurance companies. The PSI recommended a total offense level of 39 consisting of: (1) a base offense level of seven, pursuant to U.S.S.G. § 2B1.1(a)(1); (2) a 22-level increase for an "intended loss amount of $58,209,385," pursuant to the table in § 2B1.1(b)(1); (3) a two-level increase for the number of victims, pursuant to § 2B1.1(b)(2)(A)(i); (4) a two-level increase for sophisticated means, pursuant to

§ 2B1.1(b)(10)(C); (5) a two-level increase for vulnerable victims, pursuant to § 3A1.1(b)(1); and (6) a four-level increase for her role as a leader, pursuant to § 3B1.1(b)(1).

While the table in § 2B1.1(b)(1) uses the term "loss," the commentary explains that the loss amount is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). And "intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict . . . ." *Id.* § 2B1.1 cmt. n.3(A)(ii).

With Beetle's total offense level of 39 and her criminal history category of I, the PSI recommended: (1) an advisory guidelines range of 262 to 327 months' imprisonment; and (2) a restitution amount of $17,242,910.95.

Beetle objected to the PSI's factual statement that she and Snyder submitted approximately $58,209,385 in insurance claims and received $20,209,691 in insurance payments. Beetle contended that she and Snyder submitted approximately $10,801,140 in claims and received $3,974,151, during the nine months she was "present" on a day-to-day basis, and that amount should be her relevant conduct. Beetle also contended that some urinalysis was legitimate, some therapy took place, and the government identified only $39,064 in payments for unattended group therapy sessions.

Beetle also objected to the 22-level increase based on loss amount. Beetle disputed the PSI's "intended loss amount" of $58,209,385. Beetle contended she should be held responsible for only "the amount of urine testing that was paid through August

2013, minus a percentage for the urinalysis testing that was arguably medically necessary." Beetle requested a loss amount of $4,756,444, which was the amount actually *paid* for drug testing during that time, with adjustments for properly billed urinalysis and improperly billed group therapy. She also pointed out that Snyder and another co-conspirator were held accountable for only the amount insurance companies actually paid and that it was "only just that Ms. Beetle's relevant conduct be determined similarly."

The government argued that the loss amount should reflect the entire amount *billed* up to December 2014, which was around $49.5 million. Although in August 2013, Beetle transferred her ownership interests in the businesses to Snyder, Beetle maintained a financial interest in them through December 2014.

## C.    Sentencing

At Beetle's July 29, 2022 sentencing hearing, the district court stated that the jury found Beetle participated in the conspiracy through December 2014 and that facts up to that time were "relevant for and should remain in the presentence report."

Beetle reiterated her argument that her loss amount should reflect only what the insurance companies actually paid. She also argued the amount should be reduced because (1) some patients attended group therapy and (2) one third of the urinalysis (or once per week) "would be a proper amount" and could be considered medically necessary. Beetle read from shift notes indicating that Snyder sometimes spoke with patients after a positive drug test.

During the hearing, the district court discussed Application Note 3(F) to § 2B1.1, which sets forth "Special Rules" about loss determination. The district court focused on subsection (viii), which applies to "Federal Health Care Offenses Involving Government Health Care Programs," and provides that "the aggregate dollar amount of fraudulent *bills submitted* to the Government health care program shall constitute prima facie evidence of the amount of the intended loss . . . if not rebutted." U.S.S.G. § 2B1.1 cmt. n. 3(F)(viii) (emphasis added).

The district court pointed out that this "guideline commentary says . . . the presumptive loss amount is the amount billed, not the amount paid" and that it was the defendant's burden "to show that the amount billed is inappropriate." The district court asked why Beetle was relying on the amount paid. Beetle responded that her co-conspirators were sentenced based on the amount paid, and it was wrong to punish her for going to trial. The district court stated that her co-conspirators' guidelines calculations were based on negotiated loss amounts in their plea agreements. The district court explained that it was required first to calculate Beetle's advisory guidelines range before it could consider whether to vary downward based on how she was treated compared to other defendants.

Beetle also argued that insurance companies routinely pay less than the full amount billed. Beetle stressed that trial evidence showed the total amount billed for urinalysis was $19 million, but

the total amount paid was only $4,756,044, and for most of that time, "Beetle wasn't even there."

The government argued that Beetle should be held accountable for the entire billed amount up to December 2014, which trial evidence showed was $49.5 million for both urinalysis and therapy sessions. The government pointed out that the urinalysis tests were tainted because they were procured through kickbacks and that the $19 million billed for urinalysis did not account for the evidence of hundreds of unattended therapy sessions billed to the insurance companies.

After consulting Application Note 3(F)(viii) in the commentary to U.S.S.G. § 2B1.1, the district court found that the government presented sufficient evidence of the intended loss and that Beetle failed to sufficiently rebut that evidence. Beetle pointed out that the commentary in Application Note 3(F)(viii) was for government programs and Beetle's offense conduct related to private insurance companies. The district court determined that Application Note 3(F)(viii) still provided guidance that was applicable in Beetle's case, overruled her objection, and adopted the loss amount in the PSI. The district court stated that it would take Beetle's arguments about the loss amount into account in considering a variance.

The district court sustained Beetle's objection to the two-level increase for the number of victims, lowering the total offense level to 37. The district court confirmed with the prosecutor that

the $49.5 million dollar loss amount was based on six victim insurance companies Beetle agreed were proven.

The district court calculated a total offense level of 37, which with a criminal history category I, resulted in an advisory guidelines range of 210 to 262 months. The district court then heard the parties' arguments. The government agreed that a downward variance was warranted and asked for a sentence between 72 and 80 months. Upon inquiry from the district court, Beetle's counsel said, and the government agreed, that the range would have been 57 to 71 months had the court sustained Beetle's objections and adopted her proposed loss amount. Beetle asked for "a little less" than that range.

As to restitution, Beetle reiterated that it should reflect the amount of loss actually caused by her own conduct and limited to the amount paid for only medically unnecessary urinalysis, which was $4,756,444. After confirming that the $17,242,910.95 in the PSI was based on the amount insurance providers paid for both urinalysis and therapy from the conspiracy's inception to December 2014, when Beetle left the conspiracy, the district court overruled Beetle's objection and adopted that amount as restitution "for the reasons essentially that [it] overruled" Beetle's offense level objections.

The district court explained that a downward variance was warranted by the 18 U.S.C. § 3553 sentencing factors and imposed a 60-month sentence for her health care and wire fraud conspiracy conviction and a concurrent 22-month sentence for her money

laundering conviction, for a total sentence of 60 months. The district court ordered $17,242,910.95 in restitution, to be paid joint and several with her co-conspirators.

## II. LOSS AMOUNT

### A.    General Principles

Section 2B1.1 applies to theft and fraud offenses. Under U.S.S.G. § 2B1.1(b)(1), a defendant's offense level increases with the amount of "loss" caused by the offense. In Beetle's case, for instance, the base offense level was increased by 22 levels because the district court found that the loss amount was more than $25 million but less than $65 million. *See id.* § 2B1.1(b)(1)(L).

Although the government must support its loss calculation with specific, reliable evidence, the Guidelines do not require a precise determination of loss. *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011). The district court need make only a reasonable estimate of the loss based on the available information. *Id.*; *see also* U.S.S.G. § 2B1.1 cmt. n.3(C).

Section 2B1.1 itself does not define the term "loss." Rather, as noted earlier, the commentary to § 2B1.1 "explains that the 'loss' is the greater of the actual or intended loss." *United States v. Verdeza*, 69 F.4th 780, 793 (11th Cir. 2023); U.S.S.G. § 2B1.1 cmt. n.3(A). Further, actual loss is defined as "reasonably foreseeable pecuniary harm," and intended loss is defined as "pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1 cmt. n.3(A)(i)-(ii).

## B.    New Issue on Appeal

On appeal, Beetle argues that the term "loss" in U.S.S.G. § 2B1.1(b)(1) unambiguously refers to only *actual* loss when it is given its plain and ordinary meaning.  Therefore, Beetle contends, the district court erred in considering and deferring to the Sentencing Commission's definition of "loss" in the commentary to include both actual loss and intended loss.  To make her argument, Beetle relies on this Court's recent en banc decision in *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc), issued while her appeal was pending.

In *Dupree*, this Court "overruled our precedent" holding that commentary to the Guidelines was binding unless it was plainly erroneous or inconsistent with the guideline itself, a federal statute, or the Constitution.  *Verdeza*, 69 F.4th at 793-94.  *Dupree* concluded that, after *Kisor v. Wilkie*, 588 U.S.—, 139 S. Ct. 2400, (2019), sentencing courts should defer to guidelines commentary only when, after first exhausting all the traditional tools of construction, the regulation is "genuinely ambiguous."  *Dupree*, 57 F.4th at 1274-75; *Verdeza*, 69 F.4th at 794.  Applying this new rule in *Dupree*, the Court held that U.S.S.G. § 4B1.2, the career offender guideline, unambiguously excluded inchoate offenses, and therefore the commentary including inchoate offenses within the definition of "controlled substance offense" was not binding and was entitled to no deference.  *Dupree*, 57 F.4th at 1277-79.

The problem for Beetle is that in the district court she never claimed the term "loss" in the guidelines provision was plain and

unambiguous, and she did not challenge the definition of "loss" as including both actual and intended loss in the guidelines commentary. Rather, she claimed the intended loss amount should be calculated based on the amount billed versus the amount paid. Thus, we review Beetle's new legal issue for plain error. *United States v. Rogers*, 989 F.3d 1255, 1261-63 (11th Cir. 2021). To be plain, an error must have been specifically and directly resolved by the explicit language of a statute, rule, or on point precedent from the Supreme Court or this Court. *United States v. Sanchez*, 940 F.3d 526, 537 (11th Cir. 2019).[1]

Our Court in *Verdeza* already held that *Dupree* "did not specifically and directly resolve the question of whether § 2B1.1's definition of loss is ambiguous," and thus *Dupree* cannot establish plain error. 69 F.4th at 794 (quotation marks omitted). Accordingly, under our precedent, Beetle cannot show the district court plainly erred by deferring to the definition of loss in the guidelines commentary.

## C.    Preserved Error Review

Beetle makes two additional claims as to loss amount that arguably are subject to preserved error review. We ordinarily review a district court's determination of the loss amount for clear error. *United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015). A guideline calculation error requires remand unless it was

---

[1] Beetle does not dispute that plain error review applies.

harmless, that is, it did not affect the sentence imposed. *United States v. Mathews*, 874 F.3d 698, 710 (11th Cir. 2017).

Beetle argues that the correct intended loss amount was only $49,503,037.12, which the government conceded at sentencing, rather than the $58,209,385 stated in the PSI. On appeal, the government agrees that the intended loss amount should have been the $49 million figure. But this error had no effect on the calculation of Beetle's total offense level or her advisory guidelines range. Under § 2B1.1(b)(1)'s loss amount table, either intended loss amount would have resulted in the same 22-level increase in Beetle's offense level. *See* U.S.S.G. § 2B1.1(b)(1)(L) (providing for a 22-level increase if the loss involved more than $25 million but less than $65 million).

Beetle also contends the district court improperly relied on Application Note 3(F)(viii) in the commentary, which applies only to government health care programs and not to private insurance companies. *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(viii) (stating that the aggregate dollar amount of fraudulent bills submitted to a government health care program constitutes prima facie evidence of the amount of intended loss unless rebutted). But at sentencing the district court did not apply Application Note 3(F)(viii). Indeed, it acknowledged Beetle's point that the commentary was not applicable to her offense, and merely found it provided some "guidance" on the issue of whether the intended loss amount for Beetle's conspiracy should include the total amount billed to the private insurance companies or some lesser amount, as Beetle had

argued. We cannot say the district court's reference to Application Note 3(F)(viii) was reversible error, especially given that the applicable commentary, Application Note 3(A), also instructed the district court to use the intended loss amount.[2]

### III. RESTITUTION

A defendant convicted of fraud must pay restitution to the victims of her offense. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). A restitution award must be based on the amount of actual losses the victim suffered as a result of the defendant's conduct. *United States v. Huff*, 609 F.3d 1240, 1247-48 (11th Cir. 2010). The government bears the burden of proving the victims' loss amount by a preponderance of the evidence. 18 U.S.C. § 3664(e). The government need not "calculate the victim's actual loss with laser-like precision, but may instead provide a reasonable estimate of that amount." *United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015) (quotation marks omitted).

In cases of healthcare fraud, restitution amounts must be offset by the value of medically necessary goods and services that were actually provided. *United States v. Bane*, 720 F.3d 818, 828 (11th Cir. 2013). The defendant bears the burden of proving the value of medically necessary goods or services should be deducted from the restitution amount. *Id.* at 829 n.10. That burden includes showing "that the services [she] provided were medically

---

[2] Because Beetle failed to show reversible error as to the district court's use of intended loss, we do not address her arguments regarding the proper determination of the actual loss attributable to her.

necessary." *United States v. Moss*, 34 F.4th 1176, 1193 (11th Cir. 2022).

We review *de novo* the legality of a restitution order and the factual findings supporting it for clear error. *Id.* at 1192. "We will find a clear error if, after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted).

Here, Beetle failed to show the district court's restitution amount of $17,242,910.95 was clear error. First, the district court based restitution on the amount actually paid by the insurance companies, not, as Beetle argues, on the intended loss. Beetle does not dispute that the victim insurers paid $17,242,910 for drug testing and therapy billed by her sober home and treatment center during the conspiracy period. The government carried its burden to prove the victim insurers' actual losses of $17,242,910.95. *See Huff*, 609 F.3d at 1247-48; *Martin*, 803 F.3d at 595.

Second, Beetle failed to prove the value of any medically necessary services that reduced the restitution award. *See Bane*, 720 F.3d at 829 n.10. The district court considered and rejected her argument that the urinalysis and therapy were medically necessary, and that determination is supported by the evidence. Any treatment provided at the sober home and treatment center was procured through kickbacks and prescribed by bribed doctors. While shift notes showed that employees sometimes looked at urinalysis results and occasionally spoke with a patient, the notes did not show that any medical professional used those results in

determining a treatment course. And trial evidence established that even if some patients attended therapy sessions, they were not conducted by qualified professionals. *See Moss*, 34 F.4th at 1193 (affirming the district court's restitution amount where the defendant failed to prove visits to patients were medically necessary).

## IV. CONCLUSION

For the foregoing reasons, we affirm Beetle's 60-month sentence and the award of restitution in the amount of $17,242,910.95.

**AFFIRMED.**