[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10461

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CARLOS ALFREDO VERDEZA,

Defendant- Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20470-JEM-1

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and MARCUS, Circuit Judges.

ROSENBAUM, Circuit Judge:

For almost over a year, physician assistant Carlos Verdeza evaluated patients and prescribed them physical therapy. The clinics where Verdeza worked then billed the patients' health insurance both for the evaluations and for the subsequent physical therapy. The problem—for Verdeza and for the health-insurance company—was that the "patients" didn't really need the physical therapy and didn't actually receive any treatment. When the health-insurance company grew suspicious of the abnormally high rate of physical-therapy prescriptions from the clinics, it cooperated with an FBI investigation into the clinics.

That investigation led a grand jury to indict Verdeza on eight healthcare-fraud-related charges. After a trial, a jury convicted Verdeza on three counts. Now on appeal, Verdeza raises several challenges to his conviction—sufficiency, evidentiary, and instructional—and to his sentence. After a thorough review of the record and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

### A.  Factual History

In November 2016, Carlos Verdeza, a physician assistant, began working at two clinics in the South Florida area:  Guerra

Medical Center and Double R Therapy Center.[1]  Neither clinic was a real healthcare facility.  Rather, both were fronts for fraud.  The clinics—run by the same ownership group—used recruiters to find and entice people with Blue Cross Blue Shield ("BCBS") health insurance to come to the clinics.  To persuade people to be "patients," the clinics paid them kickbacks.

When the "patients" arrive[d] for their "treatment," Verdeza would briefly see them, perform no (or very little) examination, and prescribe physical therapy.  For instance, in one instance, Verdeza asked the "patient" only two questions before prescribing physical therapy.  The "patients" didn't return to the clinic and generally didn't receive physical therapy.  Yet at the clinic, "patients" signed dozens of forms attesting that they had received treatment.  Because one evaluation justified only a limited number of treatments, Verdeza often signed two or three forms falsely stating that he had "reevaluated" the "patients" and that they needed more physical therapy—even though he never saw the "patients" again.

Between November 2016 and January 2018, Guerra and Double R billed BCBS for $3.4 million and received around $1.2 million in reimbursement.  But eventually, BCBS grew suspicious.  It noticed that Guerra and Double R billed for a lot more physical

---

[1] We take these facts from the evidence presented at trial, viewed in the light most favorable to the verdict.  *See United States v. Takhalov*, 838 F.3d 1168, 1169 (11th Cir. 2016).

therapy (and more expensive physical therapy) than did peer clinics.

So BCBS asked for supporting documentation. The clinics submitted "cookie cutter" forms—that is, they "used the same information over and over again." So BCBS denied the claims.

Separately and coincidentally, the FBI learned of the clinics' existence through its biller, Rafael Izquierdo. As it turned out, Izquierdo had been arrested and agreed to cooperate in a different healthcare fraud investigation.

### B. Procedural History

The United States indicted Verdeza on eight counts of healthcare fraud. Count I charged conspiracy to commit healthcare fraud and wire fraud, in violation of 18 U.S.C. § 1349, and Counts II through VIII alleged substantive healthcare fraud linked to particular claims for reimbursement, in violation of § 1347. Counts II, V, and VII were for fraudulent claims for reimbursement submitted for treating "patients" E.G., N.T., and S.B, respectively.

### 1. Trial

Verdeza's case proceeded to a six-day jury trial. In its case in chief, the government—without objection—used the FBI case agent to summarize the scheme. The agent explained that recruiters found and paid "patients" with BCBS insurance to go to the clinics and sign undated forms indicating that they had received physical therapy. A co-conspirator then ensured the forms matched the bills that the clinics eventually submitted. The FBI case agent

also mentioned other members of the conspiracy who hadn't yet testified (and some who never testified), like the clinic's owners and the physician who nominally "supervised" Verdeza. Besides this, the government introduced patient files from five of the six "patients" mentioned in the indictment.

During the FBI case agent's testimony, the government sought to introduce Exhibit 22, which had four subparts. Verdeza didn't contest the admission of Exhibit 22A or Exhibit 22B. Exhibit 22A was a Final Order from the Florida Board of Medicine accepting a settlement agreement with Verdeza in 2006. Exhibit 22B was a settlement agreement in which Verdeza both admitted to the facts alleged in an administrative complaint filed against his medical license and agreed to pay restitution and perform community service.

But Verdeza objected to the admission of Exhibit 22C and Exhibit 22D as unnoticed Rule 404(b) evidence. Exhibit 22C was the administrative complaint that resulted in the 2006 Final Order. That administrative complaint alleged that Verdeza had signed evaluation forms for patients he didn't actually see or treat. Exhibit 22D was the corresponding investigative report. In Verdeza's view, the evidence was unnoticed Rule 404(b) evidence because, even though the government had previously provided him with the complaint and report, it hadn't told him it planned to introduce the documents at trial. The district court overruled the objection and admitted the administrative complaint and investigative report into evidence.

The government also introduced testimony from Verdeza's alleged co-conspirators. For instance, Hernandez testified that she helped ensure that the "patients'" treatment records matched the billing (as the billing records were created first). Hernandez first met Verdeza at a separate clinic named Culumbia. She vouched for Verdeza with the owners of Guerra and Double R because she knew that Verdeza would engage in fraud and "could do the paperwork in a much better fashion." While at the clinics, Hernandez met with Verdeza several times a week to fill in information on patient charts to match what the clinic's biller had decided to charge. Hernandez later opened her own medical clinic—named Esmeralda—to commit fraud. She hired Verdeza to do the same thing for her—"examine" "patients" and prescribe them physical therapy.

Along the same lines, Jesus Kenny Rosario, one of the clinics' owners, testified that he'd hired Verdeza—on Hernandez's recommendation—because Verdeza would "be willing to kind of work with" the fraudsters. For example, at one point, a physical therapist demanded to see the "patients" every visit, and Verdeza complained to Rosario that "the [physical therapist] should kind of know what this business entails and he should be okay with it as well, and . . . . play ball like that." Rosario explained that, if Verdeza had similarly refused to "play ball"—i.e., refused to sign reevaluation forms for "patients" he hadn't seen—he would have fired Verdeza. Rosario said that anyone at the clinic would have been suspicious of the fact that there were a lot of patient charts and

very few patients.  Even though not everyone in the clinic knew about the fraud, he said, Verdeza did.

Next, Rafael Izquierdo, the clinic's billing person, testified that he did the clinic's paperwork and filled in diagnoses and treatment codes, rather than a doctor.  He said that, at a real clinic, the physician would make that determination.  Finally, five "patients" testified that they had gone to the clinic, met with Verdeza, signed thirty or more forms attesting to "treatment" they received, and never went back.

When it came time for the district court to charge the jury, the court gave an instruction on deliberate indifference over Verdeza's objection.  The district court also instructed the jury that leading questions weren't evidence.

Ultimately, the jury convicted Verdeza on three substantive counts and acquitted him on the conspiracy charge as well as four substantive counts.

## 2.  Sentencing

The Presentencing Investigative Report ("PSI") initially attributed to Verdeza a loss amount of $5.2 million and concluded that Verdeza owed restitution in the amount of $1.75 million. Verdeza objected.  He asserted that his loss amount should reflect only the amount billed for the three "patients" for which he was convicted—or $165,310.  He also objected to the lack of a minor-role reduction.  The government conceded that, given that Verdeza joined the conspiracy after it began, the proper loss amount should be $3.4 million, and his total restitution owed was $1.195 million.

Although the district court overruled the objections, it accepted the concessions. In explaining its reasons for overruling the loss-related objections, the district court first recognized that the jury had acquitted Verdeza on some of the counts because it didn't believe that evidence beyond a reasonable doubt established the alleged violations. Even so, the district court found that a preponderance of the evidence supported the (acquitted) counts and held Verdeza responsible for $3.4 million in loss. Given those determinations, the district court calculated Verdeza's final offense level as 24 and his criminal history category as I, which gave Verdeza a Guidelines range of 51 to 63 months. The district court departed downward and sentenced Verdeza to 48 months' incarceration and ordered $1.195 million in restitution. Verdeza timely appealed.

## II.    STANDARD OF REVIEW

In evaluating whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the prosecution and draw all reasonable inferences and credibility choices in favor of the jury verdict. *United States v. Takhalov*, 838 F.3d 1168, 1169 (11th Cir. 2016). And unless no reasonable construction of the evidence supports the jury's guilty verdict beyond a reasonable doubt, we must affirm a conviction. *Id.* We review for an abuse of discretion preserved evidentiary rulings. *United States v. Hill*, 643 F.3d 807, 840 (11th Cir. 2011). We review unpreserved objections for plain error. *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021).

When we review a trial court's jury instructions, "[w]e apply a deferential standard of review." *United States v. Puche*, 350 F.3d

1137, 1148 (11th Cir. 2003) (internal citations omitted). We reverse only if our review leaves us "with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." *Id.* In making this evaluation, we consider the jury charge as a whole. *Id.*

We review for clear error a district court's decision as to whether a defendant qualifies for an adjustment under the Guidelines. *United States v. Boyd*, 291 F.3d 1274, 1277 (11th Cir. 2002). We also review for clear error an amount-of-loss determination. *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007). As to the legality of a restitution order, we review that de novo, but we review for clear error the factual findings underlying it. *United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011). Finally, we review the substantive reasonableness of a sentence for an abuse of discretion. *United States v. Irey*, 612 F.3d 1160, 1188–89 (11th Cir. 2010) (en banc).

## III.    DISCUSSION

Verdeza makes four arguments on appeal. *First*, Verdeza asserts that the evidence was insufficient to support his convictions. *Second*, he argues that the district court made erroneous evidentiary rulings that prejudiced his right to a fair trial. *Third*, he contends that the district court erred in giving a deliberate-indifference jury instruction. And *fourth*, Verdeza says that the district court erred in sentencing him in denying him a minor-role reduction, calculating his loss amount, determining his restitution, and imposing

a substantively unreasonable sentence.  We consider each argument in turn.

### A. *Sufficiency of the Evidence*

Verdeza makes a three-pronged attack on the sufficiency of the evidence.  First, he argues that what he did didn't advance the fraud.  Second, in Verdeza's view, even if his actions did further the fraud, his help did so only after the fraud had been committed.  So, Verdeza says, he cannot be liable as a principal, only as an (uncharged) accessory after the fact.  And third, Verdeza asserts that sufficient evidence fails to support the jury's finding of his intent to commit fraud.

1.  <u>Aider and Abettor Liability and Accessory-After-the-Fact Liability</u>

Verdeza contends that the fraud—which he concedes occurred—consisted of filling out and submitting fraudulent bills, but he insists that he had no part in either of those activities.  According to Verdeza, falsifying evaluations didn't aid the creation of the fake bills.  And importantly, in Verdeza's view, the patient files were never submitted to BCBS for review.  In the alternative, Verdeza says that, if backdating patient charts after the bill was submitted did advance the fraud, then he was only an accessory after the fact, not an aider and abettor—which was a theory under which he wasn't charged.  We are not persuaded.

Verdeza was convicted of three counts of healthcare fraud. The healthcare fraud statute criminalizes "knowing[] and willful[] execut[ion], or attempt[ed] . . . execut[ion], [of] a scheme or

artifice" to either (1) "defraud any healthcare benefit program" or (2) "to obtain, by means of false or fraudulent pretenses, representations, or promises, an of the money" of a healthcare program. 18 U.S.C. § 1347. Because of the "knowing[] and willful[]" mental state required, "in a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007). A person makes a false claim if the treatments that were billed were "not medically necessary[ ] or were not delivered to the patients." *Id.* at 1304.

Verdeza was charged as an aider or abettor, which describes one who "aids, abets, counsels, commands, induces or procures [a crime's] commission" or who "willfully causes an act to be done," and directs that he is guilty as a principal. 18 U.S.C. § 2. Aider-and-abettor liability is distinct from accessory-after-the-fact liability, which occurs when someone, "knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment[.]." *Id.* § 3. So an aider and abettor assists the commission of a crime, but an accessory after the fact participates in only the crime's cover-up.

Here, sufficient evidence supported the jury's verdict because Verdeza aided and abetted the scheme in three ways. *First*, he performed (cursory) examinations and recommended unnecessary physical therapy for the "patients." The "examinations" were critical to the fraud because they enabled the clinic's owners to bill

for physical therapy. In other words, the "examinations" themselves were helpful. Indeed, Izquierdo and the FBI case agent both testified that the "examinations" allowed the clinic to perform the fraud in a more credible way. And the false notes aided the fraud because, if BCBS questioned the clinics, the documentation would (in theory) support payment. Put differently, the "examinations" and the false notes gave the fraud ring the ability and confidence to submit a stream of false claims over the more-than-yearlong period of the fraud.

*Second*, Verdeza gave BCBS fake reports that Verdeza had reevaluated the "patients" and they needed more physical therapy. But in reality, Verdeza never saw any of the "patients" again. Indeed, Rosario testified that Verdeza signed the reevaluation reports even though he hadn't seen the "patient" again. The reevaluations were important because they allowed the clinics to bill for twelve more sessions per "patient" per reevaluation.

And, *third,* Hernandez testified that she met with Verdeza every few weeks to go over the paperwork and ensure that the medical charts matched the bills before the bills were submitted. So Verdeza was directly involved in falsifying the claims forms.

Verdeza's assertion that his evaluations assisted the fraud only after the fact is similarly unpersuasive for the same reasons. In particular, Verdeza signed forms attesting falsely that he had reevaluated "patients," and those forms were then used to bill for more physical therapy. That is, those falsified reevaluation forms were necessarily created and submitted *before* the bills for extra physical-

therapy sessions were submitted.  In other words, Verdeza's conduct advanced the fraud *before* it was consummated, not merely afterward.

## 2. Intent

Verdeza also argues that insufficient evidence proves that he acted knowingly and willfully as the statute requires.  We disagree.

*First*, clinic owner Rosario testified that he hired Verdeza because Hernandez said that Verdeza would "be willing to kind of work with [them]."  And indeed he was:  Verdeza did perfunctory physical examinations (if any).  Verdeza told Rosario that—in reference to another physical therapist who insisted on seeing "patients" every time they came in—that the physical therapist "should kind of know what this business entails and he should be okay with it as well [and] play ball like that."  Rosario said he knew that Verdeza knew the whole practice was fraudulent because "[Verdeza] would still sign the exam form," even if he hadn't reexamined the "patient."

There's more still.  Hernandez testified that she recommended Verdeza because she had committed healthcare fraud with him in a prior clinic and knew that he would commit fraud without asking any questions.  And Verdeza settled a case with the Florida Board of Medicine for signing exam forms for "patients" he hadn't treated—this exact same fact pattern.  While that fact isn't probative of whether he did that this time, a scheme with the same modus operandi can show intent, knowledge, plan, and lack of mistake.  *See* FED. R. EVID. 404(b); *United States v. Williams*, 527 F.3d

1235, 1247 (11th Cir. 2008) (history of non-compliance with federal grant regulations was admissible to prove intent to defraud).

In short, sufficient evidence allowed the jury to find beyond a reasonable doubt that Verdeza knew the bills were fraudulent.

### B. Evidentiary Rulings

Verdeza also challenges some of the district court's evidentiary rulings. *First*, he says the district court erred in allowing the FBI agent to introduce summary testimony. *Second*, he contends that the district court improperly admitted extrinsic evidence of prior bad acts under Rule 404(b). And, *third*, he argues that the district court erred in allowing the government to rely heavily on leading questions.

### 1.  Summary Testimony

Verdeza argues that the district court should not have allowed the FBI case agent to testify as a "summary" witness about things she didn't personally know and about things that had not yet been presented to the jury. The government responds that Verdeza never objected to this testimony, so we should review for (at most) plain error.

We agree with the government that Verdeza did not preserve this objection. The FBI case agent testified for an hour and forty minutes on direct examination. Verdeza objected for the first time, over an hour into her testimony, to argue that he wasn't associated with Guerra and Double R clinics in September 2017. He objected again two minutes later for hearsay. Neither objection

alerted the district court that Verdeza thought the summary nature of the FBI case agent's testimony was improper.

Given Verdeza's failure to preserve this argument, we review it for plain error only. *United States v. Presendieu*, 880 F.3d 1228, 1237–38 (11th Cir. 2018). Under the plain-error standard, a defendant must establish (1) an error; (2) that is plain; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* Because we've never held that summary testimony, in and of itself, is improper, *see United States v. Khan*, 794 F.3d 1288, 1300 (11th Cir. 2015); *United States v. Ransfer*, 749 F.3d 914, 927 & n.14 (11th Cir. 2014), any error cannot be plain. *United States v. Chau*, 426 F.3d 1318, 1322 (11th Cir. 2005) ("[W]here the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it.") (citation omitted). For that reason, Verdeza's argument necessarily fails.

## 2. Prior Bad Acts

Verdeza makes three distinct arguments related to the Rule 404(b) evidence the government introduced. *First*, he says that the government failed to provide him with notice of how it intended to use the evidence. *Second* and *third*, he contends that the evidence of his prior bad acts with Hernandez at the Culumbia clinic and the Esmerelda clinic were improper propensity evidence. None of Verdeza's arguments have merit.

As to his first argument, Verdeza relies on the wrong version of the Federal Rules of Evidence. Under the 2011 version—in effect at his trial—the government was not required to provide notice of the purpose for which it intended to use Rule 404(b) evidence. FED. R. EVID. 404(b)(2) (2011). It was only in 2020 that Rule 404(b)(3) was added, requiring the government to articulate the permitted purpose for which it intended to use the evidence. FED R. EVID. 404 (committee notes on 2020 amendment) (explaining that "Rule 404(b) has been amended principally to impose additional notice requirements on the prosecution in a criminal case.").

As to Verdeza's second and third arguments—relating to his time working with Hernandez committing healthcare fraud at other clinics—we conclude that the evidence that Verdeza worked with Hernandez at a separate clinic had a proper Rule 404(b) purpose—knowledge, lack of mistake, and plan. *See* Rule 404(b). As we've mentioned, Verdeza's defense was that he just happened to be at a clinic with Ibelis Hernandez at which massive amounts of healthcare fraud happened, outside his knowledge. So the fact that Verdeza worked with Hernandez at other clinics where healthcare fraud occurred was probative of whether Verdeza knew healthcare fraud was occurring at this clinic. *Cf. United States v. Pepe*, 747 F.2d 632, 670 (11th Cir. 1984) (explaining that the evidence "showed that Facchiano committed prior acts sufficiently similar to one or more crimes charged in the indictment to permit the inference that he intended to commit such crime.").

### 3. Leading Questions

Finally, Verdeza complains that the government asked too many leading questions. We are unpersuaded that the leading questions made a difference in the outcome of the trial.

Rule 611 of the Federal Rules of Evidence provides that "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony." FED. R. EVID. 611(c).

While the government asked at least eighteen leading questions over the course of the trial, the district court sustained sixteen of the eighteen objections for leading questions. Here are the remaining objected-to-as-leading questions that the district court allowed into evidence. Of the BCBS Investigator, the government asked,

> Q: **And does Medicare or does Blue Cross Blue Shield reimburse for services that were never actually provided or rendered?**
>
> A: Absolutely not.
>
> [Objection overruled and not re-asked because it had already been answered]

And of co-conspirator Hernandez, the government inquired,

> Q: Prior to coming to court today, how many times have you met me?
>
> A: I believe it was two times.

Q:   **And the first was on Thursday August 1, 2019?**

[Objection]

Q:   Do you recall having testified before a federal grand jury on August 1, 2019?

A:   Yes.

Even assuming the questions were leading (not necessarily a correct assumption as to the first question), neither question was substantive nor changed the result in any way. On top of that, the district court instructed the jury that the lawyer's questions weren't evidence. We presume jurors follow a judge's instructions. *Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985) ("Jurors are presumed to follow the law as they are instructed."). And Verdeza emphasized the number of leading questions in his closing. In his words, "[The prosecutor] had to get up and he had to say to him, oh you meant the physical therapy notes didn't you? And he had to keep leading his witnesses. He had to keep spoon-feeding him the testimony that he wanted them to spit back at you." So besides the fact that Verdeza objects on appeal to only two purported leading questions that didn't add to the government's case, his discussion of the leading questions in his closing played right into the district court's instructions to the jury that the lawyers' questions weren't evidence.

In short, the minimal leading questions Verdeza points to here do not allow Verdeza to overcome the overwhelming evidence of his guilt at trial.

### C. Jury Instruction

Next, Verdeza argues that the district court erred in giving a deliberate-ignorance instruction because no evidence suggested that Verdeza had deliberately avoided learning of the scheme. Given the split verdict—Verdeza was acquitted of the conspiracy charge and some of the substantive counts——he asserts, the error wasn't harmless.

We've explained that "deliberate ignorance of criminal activity [is] the equivalent of knowledge." *United States v. Maitre*, 898 F.3d 1151, 1157 (11th Cir. 2018). But "[a] deliberate ignorance instruction is appropriate only when there is evidence in the record showing the defendant purposely contrived to avoid learning the truth." *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993) (citation omitted). We have explained that a court errs in giving the instruction "when the evidence only points to either actual knowledge or no knowledge on the part of the defendant." *Id.* But "when the evidence could support both actual knowledge or deliberate ignorance and the jury was instructed on both," giving a deliberate instruction is not error. *Maitre*, 898 F.3d at 1157.

Verdeza's argument lacks persuasive force for two reasons. For one, the record contains evidence that would have allowed the jury to conclude that Verdeza deliberately put his head in the sand. For instance, the "patients" testified that Verdeza did minimal (or no) examinations on them. One construction of this fact is that Verdeza did this to avoid learning that his "patients" weren't actually injured. In addition, the clinic owner Rosario testified that

there were "many charts but very few patients walking through the door." In other words, the circumstances were quite suspicious. And the jury could have chosen not to credit the evidence supporting the notion that Verdeza had actual knowledge. So we cannot say that the district court erred in giving the deliberate-ignorance instruction.

And second, because the evidence sufficiently supported a finding of *actual* knowledge, any error in giving the deliberate-ignorance instruction was harmless. Indeed, clinic owner Rosario testified that Verdeza knew about the scheme:

> Q:    Now, you had other conversations with [Verdeza] about signing forms when patients weren't present, did you not?
>
> A:    Yes.
>
> Q:    That's fraud, isn't it?
>
> A:    Yes, sir.
>
> …
>
> Q:    Now, you mentioned the [principals] were the ones who knew fraud was being committed. And who were the people who knew fraud was being committed?
>
> A:    [Listing people]
>
> Q:    Carlos Verdeza?
>
> A:    Yeah. Yes, he did know.

Given our ruling in *Maitre* that there is no error to give a deliberate ignorance instruction when the evidence "could support both actual knowledge or deliberate ignorance," we find no error here. *Maitre*, 898 F.3d at 1157.

## D.  Sentencing Issues

We next turn to Verdeza's challenges to his sentence. *First*, Verdeza asserts that the district court erred in calculating his loss amount because it held him accountable for conduct for which he was acquitted. *Second*, Verdeza takes issue with the district court's decision not to award a minor-role reduction. *Third*, Verdeza complains that the district court clearly erred when it ordered him to pay $1.195 million in restitution. And *fourth*, Verdeza contends that his sentence was substantively unreasonable.

### 1.  Loss Amount

Verdeza first complains about the loss amount of $3.4 million. He argues that his acquittal on several substantive counts and the conspiracy charge deprived the district court of the ability to include losses ascribed to the conduct charged in those counts. Rather, Verdeza posits, the district court should have used one of several different numbers. The lowest number Verdeza urges is $1,040, or the amount the clinics received for the three visits listed in the indictments. His next lowest alternative is the amount for all the "patients" *he* saw at Guerra and Double R —$118,918 in billing or the $21,793 that was actually paid. Finally, he proffers that he should be held liable for the total amounts billed or received for the

three "patients" identified in the counts on which he was convicted—$165,310 billed or $64,801 received.

When we heard this case, the answer to Verdeza's challenge was straightforward under our precedent. Guidelines § 2B1.1 enhanced his offense level for the "loss" caused. We then turned to the commentary to the Guidelines for the meaning of "loss" as § 2B1.1 employs the term. *United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996). The commentary, in turn, explains that the "loss" is the greater of the actual or intended loss. U.S.S.G. cmt 3(A)(ii); *United States v. Moran*, 778 F.3d 942, 973 (11th Cir. 2015). And given that defendants in a jointly undertaken criminal activity—whether or not charged as a conspiracy—can be held liable for all acts and omissions of the others, Verdeza's challenges lacked merit. U.S.S.G. §1B1.3(a)(1)(B). Verdeza could be held liable for his coconspirator's acts, even though he was acquitted of the conspiracy charge, and he could be held liable for the amount that the schemes intended to steal.

But after we heard oral argument on this case, our decision became a little bit trickier. That's because in *United States v. Dupree*, we overruled our precedent on how the Guidelines and the commentary interact. 57 F.4th 1269 (11th Cir. 2023) (en banc). Before *Dupree*, the commentary was binding on federal courts unless the commentary was "plainly erroneous or inconsistent with the guideline itself, a federal statute[,] or the Constitution." *United States v. Wilson*, 993 F.2d 214, 216 (11th Cir. 1993) (citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)). But in *Dupree*, we held that

21-10461                 Opinion of the Court                          23

after *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408–09 (2019), courts could defer to the commentary only when the regulation is "genuinely ambiguous," *Dupree*, 57 F.4th at 1275–78, after "exhaust[ing] all the 'traditional tools' of construction," *id.* at 1275 (quoting *Kisor*, 139 S. Ct. at 2415).

Still, though, Verdeza did not preserve the question of whether § 2B1.1's definition of "loss" is ambiguous and thus requires resort to the Guidelines commentary. So we must consider that question under plain-error review. *See United States v. Sanchez*, 940 F.3d 526, 537 (11th Cir. 2019). And that's where the answer becomes clear.

As we have explained, "[a]n error cannot be plain unless the issue has been specifically and directly resolved by . . . on point precedent from the Supreme Court or this Court." *Id.* But whatever else *Dupree* did, it did not "specifically and directly resolve[]" the question of whether § 2B1.1's definition of "loss" is ambiguous. So it did not "specifically and directly resolve[]" that *Orton*'s holding that "loss" means the greater of intended or actual loss is wrong.

Because *Dupree* didn't "specifically and directly resolve[]" that *Orton*'s holding is wrong, we must follow *Orton* in our plain-error review. *Del Castillo*, 26 F.4th at 1223. And *Orton* requires district courts to consider the intended loss amount when calculating the loss attributable to the defendant for the purposes of determining his Guidelines range. See *Orton*, 73 F.3d at 333. So the district court did not err in attributing a loss amount of $3.4 million based on what it found to be the loss amount Verdeza intended.

### 2.  Minor-Role Reduction

Next, Verdeza argues that the district court clearly erred in denying his request for a minor-role reduction.  Verdeza contends that he didn't have a proprietary role in the scheme; he didn't own or manage the clinics; he didn't submit fraudulent bills; he didn't pay kickbacks; he didn't help organize the scheme; and he didn't recruit any "patients."  Not only that, Verdeza urges, but he adds that a medical doctor supervised him, and almost all the gains came from fraudulent billing for physical therapy, not his evaluations.  Finally, he notes that he made $130,000 over two years—a mere fraction of the $1.2 million paid out to the scheme and even less compared to the $3.4 million for which he is being held responsible.

The Guidelines provide a two-level reduction for "minor" participants and a four-level reduction for "minimal" participants.  U.S.S.G. § 3B1.2.  But that's all § 3B1.2 says.  The commentary fleshes out what those terms mean.  *See United States v. De Varon*, 175 F.3d 930, 939 (11th Cir. 1999) (describing commentary).  So this issue may seem like it presents another *Dupree* problem.  But as it turns out, we needn't decide whether *Dupree*'s admonition that commentary can be used only when the Guideline is ambiguous abrogates our precedent on § 3B1.2 because, whether we rely on the Guideline text or the commentary, the district court did not clearly err in denying the reduction.

On the one hand, if *Dupree* abrogated our precedent and the term "minor" is unambiguous (meaning we cannot consider the commentary), then the district court did not clearly err in denying

21-10461                Opinion of the Court                25

the reduction. "Minor" means "inferior in importance, size, or degree: comparatively unimportant." *Minor*, MERRIAM-WEBSTER'S DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/minor (last accessed May 8, 2023). That does not describe Verdeza's role in the scheme. For over a year, Verdeza held himself out as a physician, interacted with "patients," doctored notes, prescribed physical therapy, and wrote fake reevaluations—crucial for another cycle of billing. We cannot say the district court clearly erred in finding that those facts meant that Verdeza's role wasn't "comparatively unimportant."

On the other hand, if *Dupree* abrogated our precedent and the term "minor" is ambiguous (or if *Dupree* didn't abrogate our precedent), then we can continue to rely on our precedent (which relies on the commentary).[2] In determining whether a defendant is entitled to a role reduction, the district court must consider (1) the defendant's role measured against the relevant conduct for which he has been held accountable at sentencing, and (2) his role as compared to other participants in that relevant conduct. *See United States v. Rodriguez*, 751 F.3d 1244, 1258 (11th Cir. 2014).

Here, the scheme involved many uncharged, less culpable participants—the "patients" who came in for kickbacks as well as the recruiters and the physician who supervised Verdeza. *See, e.g., United States v. Zaccardi*, 924 F.2d 201, 203 (11th Cir. 1991) ("It is

[2] It's also possible that we've readopted our precedent. *See United States v. Gruezo*, --- F.4th ---, 2023 WL 3263506, at *7 (Mar. 30, 2023) (relying on Section 3B1.2's commentary).

entirely possible for conspiracies to exist in which there are no minor participants or for which the least culpable participants, for whatever reason, were not indicted.  In either case, the fact that a particular defendant may be least culpable among those who are actually named as defendants does not establish that he performed a minor role in the conspiracy.").  And as we've mentioned, Verdeza (1) met with patients, (2) doctored treatment notes, (3) falsified evaluations, (4) made up reevaluations, and (5) ensured that bills matched treatment notes.  We cannot say that the district court clearly erred in finding that Verdeza's role was more than "minor."

Given that Verdeza doesn't argue that the district court focused exclusively on one factor or the wrong facts, and evidence supports the district court's choice, the district court didn't clearly err.  *See United States v. Valois*, 915 F.3d 717, 732 (11th Cir. 2019) (affirming denial of minor role reduction for drug transporters who (1) only transported drugs and (2) weren't even the master of the ship and (3) had no propriety ownership in the scheme or decision-making capacity).

### 3.  Restitution

Third, Verdeza argues that the district court clearly erred in requiring him to pay $1.195 million in restitution—jointly and severally with his codefendants—to BCBS.  Instead, he says, he can be held responsible for repaying only the amount caused by *his* conduct.

The Mandatory Victim Restitution Act provides that district courts must order restitution in crimes against property cases equal

to the value of the lost property. 18 U.S.C. § 3663A(b). Unlike with the Guidelines adjustment for loss amount, we consider only the amount that the victim actually lost. *United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015). Indeed, restitution is based on "a victim's actual loss directly and proximately caused by the defendant's offense of conviction." *United States v. Collins*, 854 F.3d 1324, 1336 (11th Cir. 2017) (citations omitted). However, if more than one defendant contributes to the loss of a victim, the court may make each defendant liable for the payment of the full amount of restitution. 18 U.S.C. § 3664(i). A district court can consider uncharged conduct for purposes of restitution—even conduct that is outside the statute of limitations—as long as the losses were "from the defendant's conduct in the course of the scheme." *United States v. Dickerson*, 370 F.3d 1330, 1342 (11th Cir. 2004).

This argument doesn't warrant much discussion. The district court didn't err in ordering Verdeza to pay restitution (jointly and severally) with the others in his scheme because § 3664(i) allows district courts to order members of a scheme to jointly repay victims. 18 U.S.C. § 3664(i). Verdeza doesn't challenge on appeal the evidence supporting the claimed amount. And under our precedent, it was not error to consider uncharged conduct that was part of the scheme. *See id.*

### 4. Substantive Reasonableness

Finally, Verdeza contends that his sentence was substantively unreasonable.

When we review the reasonableness of a sentence, we must "consider the totality of the facts and circumstances." *Irey*, 612 F.3d at 1189. Here, the district court sentenced Verdeza to 48 months—below his Guidelines range of 51–63 months. Given that Verdeza had previously participated in very similar schemes, been investigated by the Florida regulatory board for similar conduct, and had attempted to defraud the victim of millions of dollars, we can't say that the 48-month sentence the district court imposed—slightly *below* the Guidelines range—was an abuse of discretion.

## IV.    **CONCLUSION**

For the reasons we have explained, we affirm Verdeza's convictions and sentence.

**AFFIRMED.**