[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13739

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

LUKE JOSELIN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cr-60028-WPD-1

_____

Before WILLIAM PRYOR, Chief Judge, and NEWSOM and ANDERSON, Circuit Judges.

PER CURIAM:

Luke Joselin appeals his convictions and sentence for conspiring to commit and committing wire fraud, 18 U.S.C. §§ 1349, 1343, and aggravated identity theft, *id.* § 1028A(a)(1). Joselin argues that insufficient evidence supports his conviction for aggravated identity theft and that the district court erred by admitting bad-character evidence, Fed. R. Evid. 404(b). He also argues, for the first time on appeal, that the loss calculation supporting his enhanced advisory sentencing range failed to adhere to *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), and *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc), because the district court relied on the commentary to the Sentencing Guidelines to consider his intended loss instead of actual loss. United States Sentencing Guidelines Manual § 2B1.1, cmt. n.3(A) (Nov. 2021). We affirm.

## I. BACKGROUND

A grand jury indicted Joselin for one count of conspiring to commit wire fraud, 18 U.S.C. § 1349, nine counts of wire fraud, *id.* § 1343, and two counts of aggravated identity theft, *id.* § 1028A(a)(1). The indictment alleged that between May and August 2020, Joselin conspired with Renaldo Harrison and Judlex Jean Louis to submit fraudulent loan applications to the Paycheck Protection Program. The conspirators allegedly shared stolen personal identification information to prepare fraudulent loan applications

in the victims' names. The two aggravated identity theft counts were based on the alleged use of J.C.'s name and driver's license and T.D.'s name and social security number in fraudulent loan applications. Joselin pleaded not guilty to all charges.

Before trial, the government notified Joselin of its intent to introduce "inextricably intertwined and [Rule] 404(b) evidence" of his involvement in another fraudulent loan scheme with the Economic Injury Disaster Loan program. The government also provided notice of its intent to present testimony from Jean Louis that before 2020 he and Joselin jointly possessed multiple victims' stolen personal information, including T.D.'s information, and that the "pair always intended to use this [information] for fraud and that the [paycheck program] just provided the best opportunity." The government argued that this evidence was inextricably intertwined with the setup of the charged offenses because it established that Joselin knowingly used T.D.'s real information to submit the fraudulent loan application. After the district court deferred ruling on the admissibility of this evidence, the government agreed to proffer the testimony outside the jury's presence.

At trial, the government presented testimony about the paycheck loan program. The program was "designed and funded to offer forgivable loans to business owners in America to help them pay their employees" through the COVID-19 pandemic. The Small Business Administration administered the program but allowed private lenders to manage the loan application and disbursement process. Applicants submitted proof of eligibility and certified

the veracity of their application under penalty of fine or imprisonment.

Harrison testified that around May 2020 Joselin told him about an opportunity to obtain money through the paycheck loan program. Harrison provided Joselin with the necessary documents, including his driver's license and social security number, and Joselin submitted the application for a 15 percent fee. Harrison agreed to work with Joselin on another application for one of Harrison's companies by falsifying payroll information. Harrison later pleaded guilty to conspiring to commit and committing wire fraud.

Jean Louis testified about his role in the scheme. After meeting Joselin in 2005, the two lived together briefly until 2006 and again between 2016 and 2019. Jean Louis worked at one of Joselin's companies, 24Hour Printing, between 2017 and 2020, and received cash or digital payments. In March 2020, Joselin said that he had obtained a paycheck loan under his own name and that he intended to submit a second application using a fictitious social security number. Joselin recruited Jean Louis to apply for a loan using Jean Louis's real name and inactive company, Pricerite, and a fictitious social security number. The pair then "continued a scheme to submit applications in different victims' names, using [the victim's] driver's license and Social Security number" obtained from a government website. Jean Louis's job was to research and send the documents Joselin asked for, while Joselin's job was to edit the documents and submit the loan applications.

Jean Louis testified about two fraudulent applications that he and Joselin filed for J.C., who was Jean Louis's girlfriend, and T.D., who was a stranger. Jean Louis provided Joselin with J.C.'s real name, address, and driver's license but supplied a fictitious social security number because she did not know about the loan application. When Jean Louis began testifying about the fraudulent application for T.D., using her real name and social security number, the government requested a sidebar based on the earlier Rule 404(b) ruling. The government stated its intent to ask Jean Louis when and how he obtained T.D.'s personal information and why he shared T.D.'s information with Joselin. The government anticipated that Jean Louis would testify that he "obtained the information a long [time] ago, in the early 2000s; that he obtained it unlawfully; that he then shared it soon thereafter with [Joselin]; and that he did so for the purpose of committing other fraud with [Joselin]." The district court instructed the government to "just indicate that [Jean Louis] had obtained this information before he had given it to [Joselin] without indicating that it was for fraudulent means."

Jean Louis testified that he obtained T.D.'s personal information in 2005 and sent her information to Joselin "soon thereafter." Jean Louis again supplied T.D.'s information to Joselin in 2020 for the loan application. At some point, Joselin sent Jean Louis a text message asking for a "CPN," meaning a fictitious social security number. A later text message referenced "Jude," meaning an application using Jean Louis's real name and social security number, and "Jude CPN," meaning an application using his real name but a fictitious social security number.

On cross-examination, Jean Louis explained that he sent an e-mail titled "[J.C.]" and containing J.C.'s real information to an e-mail account that he and Joselin shared. Jean Louis also sent an e-mail titled "[T.D.]," without a "CPN" designation, to the shared e-mail account for Joselin to access. After Jean Louis's arrest, officers found several victims' identification in his home. Jean Louis pleaded guilty to bank fraud and aggravated identity theft of J.C.

On re-direct examination, the prosecutor asked Jean Louis whether he told Joselin that he did not have T.D.'s or J.C.'s permission to use their information. Jean Louis answered:

> Joselin had knowledge of everything that was going on. He knows that I did not have permission to use any of those [sic] information that I had, and he know[s] that I obtained those [sic] information that I had fraudulently, and he still encourage[d] me and indulge[d] in submitting those applications for the fraudulent PPP loans.

After the prosecutor asked whether Jean Louis had "any reason at all to believe that Mr. Joselin thought that [J.C.] or [T.D.] had given you permission to use their identities," he answered in the negative:

> Absolutely not. Mr. Joselin knew those documents and information I had were obtained fraudulently. And those were obtained—some of them were obtained in 2005 and stored in emails just for those purposes.

After Joselin objected and the district court sustained his objection, Joselin did not request a curative instruction, ask the district court to strike Jean Louis's testimony, or move for a mistrial.

Ricardo Pena, an economic crimes detective and U.S. Secret Service task force officer, testified that, based on his investigation and experience, "CPN" means a false social security number. Pena believed that Joselin knew he was committing fraud and "kn[ew] what he was doing" because his communications with Jean Louis about identities used for loan applications referenced "CPN."

Joselin moved for a judgment of acquittal on both counts of aggravated identity theft because J.C.'s and T.D.'s identifications were found in Jean Louis's possession. Fed. R. Crim. P. 29. After the district court denied the motion, Joselin declined to testify and renewed his motion for a judgment of acquittal, which was denied. The district court then cautioned the jury on Rule 404(b) evidence:

> During the trial, you heard evidence of acts allegedly done by the defendant on other occasions that may be similar to acts with which the defendant is currently charged. You must not consider any of this evidence to decide whether the defendant engaged in the activity alleged in the indictment. This evidence is admitted and may be considered by you for the limited purpose of assisting you in determining whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment, or the defendant had a motive or an opportunity to commit the acts charged in the indictment, or the defendant acted according to a plan or in preparation to

commit a crime, or the defendant committed the acts charged in the indictment by accident or mistake.

The jury acquitted Joselin of aggravated identity theft of J.C. and found him guilty of the remaining counts. Joselin moved for a new trial, Fed. R. Crim. P. 33, based on Jean Louis's testimony about Joselin's involvement in obtaining T.D.'s information. The district court denied Joselin's motion for a new trial and agreed with the government that the testimony was inextricably intertwined with the charged counts and, in any event, was admissible under Rule 404(b) for multiple non-propensity purposes.

Joselin's presentence investigation report provided a base offense level of seven, U.S.S.G. § 2B1.1(a)(1), added 18 levels based on the calculation that he was responsible for $3.6 million in intended losses, *id.* § 2B1.1(b)(1)(J), added two levels for using sophisticated means, *id.* § 2B1.1(b)(10)(C), and added two levels for his role as the organizer or leader of the scheme, *id.* § 3B1.1(c). With a total offense level of 29 and criminal history category of I, Joselin's advisory guideline range was 87 to 108 months of imprisonment plus a consecutive two years of imprisonment for the aggravated identity theft conviction.

After Joselin objected that he was responsible for a loss amount of $477,533, the government notified the probation officer that the correct intended loss amount was $1,955,479, based on $842,543 from the wire fraud counts plus $1,112,936 from Joselin's relevant conduct of submitting additional fraudulent loan applications to both the paycheck loan and the economic injury loan

programs. Based on the recalculated loss amount and a total of-fense level of 27, Joselin's advisory guideline range became 70 to 87 months followed by two years of imprisonment.

At sentencing, Joselin argued that he was responsible for an actual loss amount of $477,533, and the intended loss calculation should not include his uncharged relevant conduct. But he clarified that he had no objections to the government's exhibit that calcu-lated a total intended loss amount of $1.9 million based on charged and uncharged relevant conduct. The district court determined that the loss amount was $1.9 million because intended loss could be counted under the Guidelines and could include uncharged rel-evant conduct. Joselin objected that considering loss amounts tied to uncharged relevant conduct violated due process.

The government requested a total sentence of 94 months and argued that Joselin's conduct was "above the run-of-the-mill type" of conduct common in these loan schemes. The district court heard Joselin's allocution and argument that the statutory sentenc-ing factors, 18 U.S.C. § 3553(a), warranted a downward variance due to his health issues, community ties, and codefendants' sen-tences. The district court varied downward and sentenced Joselin to 60 months of imprisonment for the wire fraud counts and a con-secutive 24 months for the aggravated identity theft count.

## II. STANDARDS OF REVIEW

Three standards govern our review. We review the suffi-ciency of the evidence *de novo*, viewing "the evidence in the light most favorable to the government, with all inferences and

credibility choices drawn in the government's favor." *United States v. Feldman*, 931 F.3d 1245, 1253, 1257 (11th Cir. 2019) (quotation marks omitted). The evidence will be sufficient to sustain a conviction unless "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *United States v. Shabazz*, 887 F.3d 1204, 1221 (11th Cir. 2018). We review rulings on the admissibility of evidence for abuse of discretion. *Id.* at 1216. We review a sentencing challenge raised for the first time on appeal for plain error. *United States v. Ramirez-Flores*, 743 F.3d 816, 821–22 (11th Cir. 2014). Under that standard, Joselin must prove that the district court committed an error that is plain and that affects his substantial rights. *See id.*

## III. DISCUSSION

We divide our discussion in three parts. First, we explain that sufficient evidence supports Joselin's conviction for aggravated identity theft of T.D. Second, we reject Joselin's argument that the district court erred by admitting Jean Louis's testimony about T.D.'s information. Third, we explain that Joselin's challenge to the loss calculation based on *Kisor* and *Dupree* fails on plain error review and that the loss calculation is reasonable.

### A. Sufficient Evidence Supports Joselin's Conviction for Aggravated Identity Theft of T.D.

Joselin argues that the government failed to present sufficient evidence that he knew T.D.'s identification belonged to a real person. To convict Joselin of aggravated identity theft, the government had to prove that he "knew that the identity [used in the scheme] belonged to a real person." *United States v. Gomez-Castro*,

605 F.3d 1245, 1248 (11th Cir. 2010); *see* 18 U.S.C. § 1028A(a)(1). Means of identification includes "a name, social security number, date of birth, or driver's license number, among other things." *United States v. Doe*, 661 F.3d 550, 561 (11th Cir. 2011). "[K]nowledge can be inferred reasonably based on ordinary human experience for which no special proof is required; a trier of fact can rely on common sense." *Gomez-Castro*, 605 F.3d at 1249.

Sufficient evidence supports Joselin's conviction for aggravated identity theft of T.D. The government introduced evidence that Joselin submitted a fraudulent loan application using T.D.'s name and social security number and that all Joselin's fraudulent loan applications were submitted under the names of real people, including himself, Jean Louis, Harrison, and J.C. A reasonable jury could have found that, based on Joselin's pattern of submitting applications under the names of real people, he would not have submitted an application under T.D.'s name to the loan processors had he not believed that T.D. was a real person. *See id.*

The government also introduced evidence that Jean Louis and Joselin shared identities that were ready to be used for fraudulent loan applications through a shared e-mail account, and Pena and Jean Louis testified about the unique naming conventions used to designate which identity profiles were real and which profiles contained fictitious information. Jean Louis sent J.C.'s real information to Joselin in e-mails with the subject lines "[J.C.]" and "[J.C.] Checking account" and "[J.C.] Savings account." Jean Louis explained that he and Joselin used "CPN" to refer to identity profiles

that contained fictitious social security numbers, such as "Jude CPN." Jean Louis also explained that a reference to "Jude," without the "CPN" designation, referred to his identity profile using his real social security number. The government then introduced evidence that Jean Louis sent an e-mail containing T.D's real information to the shared account for Joselin to access, and the e-mail subject line was "[T.D.]," without the "CPN" designation. A reasonable jury again could infer that Joselin understood that the "[T.D.]" e-mail contained T.D's real identifying information, which he then used to file a fraudulent loan application.

### B. The District Court Did Not Abuse its Discretion Regarding Jean Louis's Unsolicited Remark.

Joselin argues that Jean Louis's testimony that he stole and sent T.D.'s information to Joselin for a shared fraudulent purpose long before the charged offense was inadmissible under Federal Rule of Evidence 404(b). He argues that, by continuing to press Jean Louis after the sidebar ruling, the government elicited prejudicial testimony and the district court erred by failing to strike the testimony or provide a limiting instruction.

The district court did not abuse its discretion. The district court instructed the government not to ask Jean Louis whether, in 2005, he shared T.D.'s information with Joselin for a fraudulent purpose. The government followed that instruction, and after it asked Jean Louis whether it was possible that Joselin could have believed Jean Louis had permission to use J.C.'s or T.D.'s information, Jean Louis said no. He then made the unsolicited remark

that some identities, though he did not specify whose, were obtained and stored for fraudulent reasons as early as 2005.

Joselin complains that after he successfully objected to Jean Louis's remark, the district court failed to strike *sua sponte* the remark or provide a curative instruction, but he never requested either form of relief. Nor did he move for a mistrial based on the testimony. *See United States v. Mosquera*, 886 F.3d 1032, 1046 (11th Cir. 2018); *United States v. Emmanuel*, 565 F.3d 1324, 1335 (11th Cir. 2009) (holding that the district court did not abuse its discretion by failing to issue *sua sponte* a curative instruction to a witness's stray prejudicial remark because "the comment was but a brief reference . . . and a curative instruction could have drawn unwarranted attention to the comment" (quotation marks omitted)). The district court also reduced the risk of prejudice by cautioning the jury that it could not consider evidence that Joselin allegedly engaged in similar uncharged acts as evidence that he engaged in the charged offenses.

## C. The District Court Did Not Plainly Err by Considering Intended Loss.

Joselin argues for the first time that the district court erred in the light of *Kisor* and *Dupree* because the term "loss" in the guideline, U.S.S.G. § 2B1.1(b)(1), unambiguously refers to actual loss, so the district court could not defer to the commentary that "loss" means the "greater of actual loss or intended loss," *id.* § 2B1.1(b)(1), cmt. n.3(A). Because Joselin never argued in the district court that "loss" in section 2B1.1(b)(1) is unambiguous nor challenged relying on the commentary, but instead argued without elaboration that

he should be responsible only for the actual loss, we review this new argument for plain error. *United States v. Verdeza*, 69 F.4th 780, 794 (11th Cir. 2023).

In *Kisor,* the Supreme Court held that a district court should defer to an agency's interpretation of a regulation "only if a regulation is genuinely ambiguous. . . . even after a court has resorted to all the standard tools of interpretation." 139 S. Ct. at 2414. We held in *Dupree* that *Kisor*'s clarification applies to the Sentencing Guidelines and that the commentary cannot deviate from an unambiguous guideline. 57 F.4th at 1275, 1277. In other words, district courts may not defer to commentary "if uncertainty does not exist in the Guideline." *Id.* at 1275 (quotation marks omitted).

The district court did not plainly err in considering the commentary to find Joselin's loss amount based on his intended loss. To be plain, an error must have been specifically resolved by controlling precedent or by the clear language of a statute or rule. *See United States v. Sanchez*, 940 F.3d 526, 537 (11th Cir. 2019). Our precedent requires district courts to consider the amount of intended loss in calculating the loss attributable to the defendant. *See United States v. Moss*, 34 F.4th 1176, 1190–92 (11th Cir. 2022); *United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996). And we recently explained that *Dupree* "did not specifically and directly resolve the question of whether § 2B1.1's definition of loss is ambiguous." *Verdeza*, 69 F.4th at 794 (quotation marks omitted, alteration adopted). Because our precedent required the district court to

consider intended loss in determining Joselin's loss amount, *see id.*, Joselin cannot establish that the district court plainly erred.

Joselin further argues that his sentence is unreasonable because the district court considered uncharged relevant conduct to hold him responsible for a loss amount of $1.9 million, but we disagree. We have held that relevant uncharged or acquitted conduct may be considered in sentencing, so long as the government proves that conduct by a preponderance of the evidence and the district court applies the Sentencing Guidelines as advisory. *See United States v. Wilson*, 788 F.3d 1298, 1317 (11th Cir. 2015). Joselin failed to dispute the accuracy of the loss calculation, so he cannot argue that the government failed to prove his relevant uncharged conduct by a preponderance of the evidence. *See United States v. Wade*, 458 F.3d 1278, 1277 (11th Cir. 2006). The district court did not treat the Guidelines as mandatory in varying downwards. *See Wilson*, 788 F.3d at 1317. And the inclusion of Joselin's relevant uncharged conduct did not increase his statutory minimum or maximum sentence. *See United States v. Charles*, 757 F.3d 1222, 1225 (11th Cir. 2014). Joselin's sentence is reasonable.

### IV. CONCLUSION

We **AFFIRM** Joselin's convictions and sentence.